UNITED STATES of America, Plaintiff–Appellee,

v.

Charles HYDE, Defendant–Appellant.

No. 91–3146.

United States Court of Appeals, Eleventh Circuit.

Nov. 9, 1992.

[*] Judges Phyllis A. Kravitch, R. Lanier Anderson, III, Emmett R. Cox and Joel F. Dubina have recused themselves and will not participate.

H. Manuel Hernandez, Longwood, Fla., for defendant-appellant.

Timothy Quinlan, Asst. U.S. Atty., Orlando, Fla., for plaintiff-appellee.

Before TJOFLAT, Chief Judge, COX, Circuit Judge, and GODBOLD, Senior Circuit Judge.

TJOFLAT, Chief Judge:

Appellant Charles Hyde appeals the sentence he received for violating 21 U.S.C. § 841(d)(2) (1988), which criminalizes the possession or distribution of a "listed chemical," here phenylacetic acid, with knowledge that it would be used to manufacture a "controlled substance," here methamphetamine. Pursuant to U.S.S.G. § 2D1.1(a)(3) (Nov. 1, 1990), the district court scored Hyde's base offense level at 36 by calculating the amount of methamphetamine that could have been produced from the phenylacetic acid that Hyde possessed. Through a slightly different analytic route, we reach the district court's result. We therefore affirm Hyde's sentence.

I.

The facts of this case are not in dispute. On July 20, 1990, Hyde prepaid an order for 110 pounds of phenylacetic acid at Sun Scientific Chemical Company in Dania, Florida. Two undercover agents from the Drug Enforcement Administration delivered Hyde's order to Hyde's sister's business. There, Hyde took possession of the phenylacetic acid knowing that it would be resold or used to manufacture methamphetamine. Hyde was arrested on July 26, 1990.

Hyde waived indictment and was prosecuted by information filed by the United States Attorney. The information charged Hyde with violating 21 U.S.C. § 841(d)(2),[1]

1. This section provides that it is illegal to "possess[ ] or distribute[ ] a listed chemical knowing,

**1438**

by possessing and distributing phenylacetic acid[2] with knowledge and reasonable cause to believe that the listed chemical[3] would be used to manufacture methamphetamine, a controlled substance. On November 26, 1990, Hyde pled guilty to violating section 841(d)(2). In his guilty plea, Hyde expressly admitted that he knew the phenylacetic acid he possessed would be used to manufacture methamphetamine. At the sentencing hearing, the district court found that U.S.S.G. § 2D1.1 applied to Hyde's violation of section 841(d)(2). Section 2D1.1(a)(3) predicates a determination of the base offense level on the amount of controlled substance involved in the crime. The court relied on the probation officer's determination that 110 pounds of phenylacetic acid could yield approximately 30 kilograms of methamphetamine, and used this converted figure to arrive at a base offense level of 36 under U.S.S.G. § 2D1.1(c)(4).

Hyde objected to this base offense level, and argued that phenylacetic acid should be scored either (1) as a Schedule III substance under 21 U.S.C. § 812 (1988), with a base offense level of 20, or (2) as the equivalent of phenylacetone/P₂P possessed for a purpose other than manufacturing methamphetamine under section 2D1.1's Drug Equivalency Tables, with a base offense level of 26. The district court rejected Hyde's position and held that 36 was the proper base offense level. The court granted a two-level reduction for Hyde's acceptance of responsibility, resulting in an adjusted offense level of 34. The district court sentenced Hyde to 120 months imprisonment,[4] the maximum sentence autho-

rized by 21 U.S.C. § 841(d), but less than the 188 to 235 months prescribed by the sentencing guidelines.[5]

## II.

Hyde's appeal of the district court's application of the sentencing guidelines to determine his base offense level for his violation of section 841(d)(2) presents a case of first impression in this circuit. We review *de novo* all questions of law that arise out of the district court's application of the guidelines. *United States v. Shores*, 966 F.2d 1383, 1386 (11th Cir.1992). In this part of our opinion, we explain how the sentencing guidelines apply to Hyde's crime. In part III, we consider and ultimately reject Hyde's proffered alternative methods of computing his base offense level.

## A.

No sentencing guideline precisely addresses violations of section 841(d)(2) under the version of the sentencing guidelines that applies to Hyde.[6] Absent a directly applicable guideline, courts are "required to determine if there is a sufficiently analogous offense guideline, and, if so, to apply the guideline that is most analogous." U.S.S.G. § 2X5.1, comment. (backg'd) (Nov. 1, 1990); *see also* U.S.S.G. § 2X5.1 ("If the offense is a felony or Class A misdemeanor for which no guideline expressly has been promulgated, apply the most analogous offense guideline."). The most analogous guideline contemplated by section 2X5.1 is the guideline that applies to the most analo-

---

or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance." 21 U.S.C. § 841(d)(2).

2. The information originally charged Hyde with possessing and distributing acetic anhydride and acetone in addition to phenylacetic acid. At arraignment, however, the parties amended the information, deleting the references to acetic anhydride and acetone.

3. "The term 'listed chemical' means any listed precursor chemical or listed essential chemical." 21 U.S.C. § 802(33) (1988). Phenylacetic acid is a "listed precursor chemical." 21 U.S.C. § 802(34)(H) (1988).

4. The district court also sentenced Hyde to three years of supervision following his release from prison, imposed a special assessment of $50, and, pursuant to 21 U.S.C. § 853a(b) (1988), declared Hyde ineligible for federal benefits for five years from the date of sentencing.

5. *See* U.S.S.G. § 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence.").

6. Because Hyde was sentenced on January 28, 1991, the November 1, 1990, edition of the Guidelines Manual applies.

gous statute of conviction. Section 2X5.1 indicates that "the most analogous offense guideline" is determined by analogy of criminal behavior, not analogy of chemicals. The commentary provides that "the type of criminal behavior" is the proper reference for determining guideline analogies. Further, section 2X5.1 instructs that "[i]f there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553(b) shall control." Section 3553(b) instructs that the sentence that is ultimately imposed should relate "to sentences prescribed by guidelines applicable to *similar offenses and offenders.*" (Emphasis added). Ours, then, is a quest to find the most analogous crime. As discussed below, we find that the attempt statute, 21 U.S.C. § 846, is the most analogous statute of conviction to section 841(d)(2).

Violation of section 841(d)(2) presumes that the final product, the controlled substance, has not yet been manufactured. Here, Hyde was convicted of possessing phenylacetic acid, a precursor chemical to methamphetamine, with knowledge that it would be used to manufacture methamphetamine, the final product. To violate section 841(d)(2), possession of a precursor chemical must be coupled with the knowledge that it would be manufactured into a controlled substance.[7] Section 841(d)(2) makes an independent crime out of the elements that otherwise would comprise an attempt to manufacture methamphetamine. Section 846 provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to *the same penalties* as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." (Emphasis added). By enacting section 846, Congress mandated that attempts be punished as severely as the underlying crime.

Conviction under section 846 for attempt to manufacture methamphetamine requires proof that the defendant intended that methamphetamine be manufactured and an act or omission that amounts to a "substan-

tial step" toward commission of the substantive crime. *See United States v. Leopard,* 936 F.2d 1138, 1140 (10th Cir.1991). Hyde both had the requisite intent and took a substantial step by purchasing the phenylacetic acid. If section 841(d)(2) did not declare that Hyde's behavior was criminal in and of itself, then Hyde could have been convicted under section 846 of attempting to manufacture methamphetamine. We therefore look to the sentencing guideline section that governs attempts to manufacture methamphetamine under section 846 as the most analogous guideline to Hyde's crime. The identity between the elements of section 841(d)(2) and section 846 suggests that section 2D1.4 provides the proper guideline section under which to sentence Hyde.

The Sixth Circuit recognized this point in *United States v. Kingston,* 922 F.2d 1234 (6th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2054, 114 L.Ed.2d 460 (1991). Kingston pled guilty to possession of phenylacetic acid with intent to manufacture and distribute methamphetamine. Just like Hyde, Kingston argued that his base offense level should not be predicated upon the amount of methamphetamine that could have been produced from the phenylacetic acid he possessed. The court rejected this argument and sentenced the defendant according to guideline section 2D1.1. *Id.* at 1237. The court focused on the kinship between section 846's criminalization of attempts and conspiracies to manufacture methamphetamine and section 841(d)(2)'s criminalization of possession of precursor chemicals with knowledge of methamphetamine's subsequent manufacture.

> The purpose of the Federal effort is to control the distribution, and thus indirectly the use, of certain chemical substances. Thus, § 841(a) makes distribution and sale illegal, and § 846 tries to prevent the substances from ever being created by making the attempt to create them illegal. Section 841(d) moves this

**7.** Hyde's guilty plea clearly establishes that he knew that the phenylacetic acid would be used

to manufacture methamphetamine.

system of control even further back in time by preventing persons from even getting close to creating the substances. Section 841(d) is thus effectively an attempt statute that penalizes acts earlier in the process of manufacturing controlled substances.

... As both § 841(d) and § 846 have the same object, limiting access to controlled substances by criminalizing attempts to create them, it is sensible that they both be punished according to the same principles.

*Id.* at 1238. The court sentenced Kingston under guideline 2D1.1, noting that section 2D1.4 utilizes the same tables to set base offense levels as does section 2D1.1. *Id.* The court applied a fairness principle to reach this sentencing result. *See id.* ("[I]t is fair that violations of § 841(d) be punished with respect to the amount of the controlled substance that the government is seeking to limit."). We simply recognize that the guidelines compel this result.

## B.

Guideline section 2D1.4 is designed to punish attempts and conspiracies that violate section 846. Recognizing that the objects of attempts and conspiracies often remain unconsummated at the time of arrest, the United States Sentencing Commission instructs sentencing courts to "approximate the quantity of the controlled substance" that "reflect[s] the scale of the offense." U.S.S.G. § 2D1.4, comment. (n. 2). Section 2D1.4 permits the conversion from phenylacetic acid to a quantity of methamphetamine for the purpose of setting a base offense level. *See United States v. Beshore,* 961 F.2d 1380, 1383 (8th Cir.1992) ("Calculation of amount of methamphetamine that could have been produced from the quantity of precursor chemicals is proper under the sentencing guidelines."); *United States v. Havens,* 910 F.2d 703, 705 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 687, 112 L.Ed.2d 678 (1991) ("[T]he trial court, upon proper testimony, may estimate the ultimate quantity

of produceable [sic] drugs. This estimate should be equal to the amount of drugs produceable [sic] if the precursor chemicals possessed by the defendant were combined with proportionate amounts of the missing ingredients including processing equipment."); *see also* U.S.S.G. § 2D1.1, comment. (n. 12) (expressly incorporating section 2D1.4's approximation principle). The district court found that the 110 pounds of phenylacetic acid that Hyde possessed could be used to manufacture 30 kilograms of methamphetamine. Hyde does not contend, and we do not find, that this was clear error. *See* 18 U.S.C. § 3742(e) (1988) (courts of appeals must "accept the findings of fact of the district court unless they are clearly erroneous").

Guideline section 2X5.1 directs application of the guideline that governs the most analogous crime. Because section 846 is the most analogous statute of conviction to section 841(d)(2), guideline section 2D1.4 governs sentencing for violations of section 841(d)(2).[8] Section 2D1.4 utilizes the same Drug Quantity Table as section 2D1.1 for setting the base offense level. Under section 2D1.1's Drug Quantity Table, 30 kilograms of methamphetamine merits a base offense level of 36. The district court's approach of sentencing Hyde directly under section 2D1.1 and our approach of following section 2X5.1 to section 2D1.4 yield the same base offense level.

## C.

While the district court's decision to apply section 2D1.1 directly to Hyde's violation of section 841(d)(2) is not without support, our approach is the proper one. The district court's approach draws support from two sources. First, Appendix A's Statutory Index includes a table that cross-references statutes of conviction with their correlative guideline sections. U.S.S.G. App. A (Nov. 1, 1990). The "index specifies the guideline section or sections ordinarily applicable to the statute of convic-

---

**8.** Under the current version of the guidelines—which became effective on November 1, 1991, and does not apply to Hyde—new § 2D1.11 is expressly designed to sentence violations of 21 U.S.C. § 841(d)(2). Under § 2D1.11, Hyde's crime would have a base offense level of 28.

tion." *Id.* The Index cross-references section 841(d) with guideline section 2D1.1.

Second, the Ninth Circuit similarly applied section 2D1.1 directly, rather than by analogy. In *United States v. Cook*, 938 F.2d 149, 150–51 (9th Cir.1991), Cook pled guilty to possession of ephedrine with the intent to manufacture methamphetamine in violation of 21 U.S.C. § 841(d)(1). The district court sentenced Cook under U.S.S.G. § 2D1.1(c) based on the amount of methamphetamine that Cook could have produced from the ephedrine he possessed. *Id.* at 151. The court affirmed the decision to sentence under section 2D1.1(c), noting that section 2D1.1 applied not by "mere analogy but an identity of crimes and punishments." *Id.* at 152. The court based its holding on section 2D1.1's heading; "Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses)." *Id.*

We do not adopt the district court's approach for three reasons. First, section 2D1.1 itself does not indicate that it applies to convictions under section 841(d). Section 2D1.1 does, however, expressly mention seven other code provisions to which it does apply. Under the doctrine of *expressio unius est exclusio alterius*, the express application of section 2D1.1 to seven other statutes of conviction strongly suggests that it does not apply to section 841(d).

Second, Appendix A's cross-reference between section 841(d) and section 2D1.1 is not binding. "This circuit's precedent clearly permits a district court to apply a sentence guideline which reflects the defendant's conduct" rather than the "guideline specified in the index." *United States v. Shriver*, 967 F.2d 572, 574 (11th Cir.1992). Because section 2D1.1 does not by its terms apply to convictions under section 841(d), section 2X5.1 requires that sentencing focus on Hyde's conduct.

Third, the district court converted Hyde's phenylacetic acid into a corresponding amount of methamphetamine solely on the authority of *Kingston*. *See* Record, vol. 3, at 9–10. Yet, *Kingston* relied on the analogy between section 2D1.4 and section 2D1.1

to support its conversion. Neither section 2D1.1 nor section 841(d) authorizes courts to convert precursor chemicals into producible quantities of controlled substances for sentencing purposes. The district court's conversion lacked statutory sanction. In contrast, our strict adherence to the guidelines does permit the conversion.

### III.

Hyde contends that the district court improperly assigned him a base offense level of 36 by sentencing him under section 2D1.1 and argues that either of two different sentencing methods would have been proper. Hyde suggests that the phenylacetic acid should have been scored either as a Schedule III substance under 21 U.S.C. § 812 (1988), or as the equivalent of phenylacetone/P$_2$P when possessed for purposes other than the manufacture of methamphetamine under section 2D1.1's Drug Equivalency Tables. We disagree.

### A.

■ Hyde initially argues that his crime should have been scored as if phenylacetic acid were a Schedule III substance under section 812. Under guideline section 2D1.1's Drug Quantity Table, possession of more than 20 kilograms of a Schedule III substance merits a base offense level of 20. If phenylacetic acid were a Schedule III substance, then the district court should have scored Hyde's base offense level at 20, not 36.

Hyde's syllogism collapses on the falsity of its initial premise. Phenylacetic acid is not a Schedule III substance. Schedule III includes "[a]ny substance (except an injectable liquid) which contains any quantity of methamphetamine, including its salts, isomers, and salts of isomers," 21 U.S.C. § 812(c), Schedule III(a)(3), but Hyde does not contend, and we do not find, that phenylacetic acid falls within this definition. Rather, Hyde reasons that, at most, phenylacetic acid can be considered the equivalent of a Schedule III substance because methamphetamine is a Schedule II sub-

stance.[9] Hyde postulates that a precursor chemical cannot be included in the same schedule as its correlative controlled substance.

Hyde's reasoning ignores the stark reality that phenylacetic acid is not listed as a Schedule III substance. Section 811 describes the rather arduous process of amending the list of substances within section 812's schedules, which, as a general matter, remain the sole province of the Attorney General. *See* 21 U.S.C. § 811 (1988). Even if the addition seems sensible, courts simply lack the authority to add substances to section 812's schedules. We decline Hyde's invitation to do so. Because phenylacetic acid is not a Schedule III substance, the district court properly refused to sentence Hyde as if it were.

### B.

■ Hyde's second argument is that he should have been punished as if he possessed phenylacetone/P₂P for a purpose other than manufacturing methamphetamine. Phenylacetic acid must be converted into phenylacetone/P₂P in order to manufacture methamphetamine. Phenylacetone/P₂P is an "immediate precursor" to methamphetamine, 21 C.F.R. § 1308(g)(1)(i) (1990), while phenylacetic acid is just a "precursor" chemical, 21 U.S.C. § 802(34)(H). Hence, Hyde contends that his sentence for possession of phenylacetic acid should be no greater than a sentence for possessing an equivalent amount of phenylacetone/P₂P. Under Hyde's theory, his sentence may not exceed the sentence that would apply to a conviction for possession of 49,896 grams (110 pounds) of phenylacetone/P₂P. While the sentencing guidelines do not endorse Hyde's chemical analogy theory,[10] we will demonstrate that Hyde's crime merits a base offense level of 36 even under his theory.

The Drug Equivalency Tables in the commentary to section 2D1.1 establish base offense levels by converting quantities of specified chemicals into sentencing-equivalent quantities of cocaine, heroin, PCP, or marihuana. This converted quantity is then located within section 2D1.1's Drug Quantity Table to determine the proper base offense level. Phenylacetone/P₂P is listed twice in the Drug Equivalency Tables under the heading "Cocaine and Other Schedule I and II Stimulants (and their immediate precursors)." The Drug Equivalency Tables convert to cocaine from phenylacetone/P₂P (1) "when possessed for the purpose of manufacturing methamphetamine," and (2) "in any other case." One gram of phenylacetone/P₂P in the former category converts to 2.08 grams of cocaine, while one gram in the latter category converts to 0.375 grams of cocaine. Hyde asserts that the second conversion factor should apply. We disagree.

Even if we accept Hyde's sentencing paradigm—determining his base offense level through application of the Drug Equivalency Tables to possession of phenylacetone/P₂P—we cannot accept his choice of the applicable conversion. Hyde's choice is simply counterfactual. In his guilty plea, Hyde expressly admitted having knowledge that the phenylacetic acid he possessed would be used to manufacture methamphetamine. The fact that phenylacetone/P₂P is chemically more proximate to methamphetamine than is phenylacetic acid does not diminish Hyde's specific intent with regard to the ultimate manufacture of methamphetamine. Although we might be willing to indulge Hyde by substituting phenylacetone/P₂P for phenylacetic acid, we will not ignore his admission that he knew that the precursor chemical was intended for the manufacture of methamphetamine.

**9.** Hyde contends that "[m]ethamphetamine is clearly a schedule II controlled substance." Initial Brief of Appellant at 7. For purposes of his argument, we do not disagree.

**10.** As discussed in part II.A., § 2X5.1 indicates that the most analogous sentencing guideline is determined by analogy of criminal behavior. The guidelines do not support Hyde's contention that he should have been sentenced as if he possessed phenylacetone/P₂P because it is analogous to phenylacetic acid.

Hence, the proper conversion reference is phenylacetone/$P_2P$ when possessed for the purpose of manufacturing methamphetamine. Multiplying 49,896 grams of phenylacetone/$P_2P$ by the conversion factor of 2.08 yields 103,784 grams, or over 103 kilograms of cocaine. Under section 2D1.1's Drug Quantity Table, 103 kilograms of cocaine merits a base offense level of 36—exactly the same base offense level employed by the district court.

### IV.

We hold that the district court properly set Hyde's base offense level at 36. Accordingly, we affirm the decision of the district court sentencing Hyde to ten years imprisonment followed by three years of supervision, imposing a special assessment of $50, and declaring him ineligible for federal benefits for five years.

AFFIRMED.