UNITED STATES of America, Plaintiff-Appellee,

v.

Vernon Victor PRATHER, Jr., a.k.a. "Billy", Defendant-Appellant.

No. 98-9094.

United States Court of Appeals,

Eleventh Circuit.

March 7, 2000.

Appeal from the United States District Court for the Northern District of Georgia.(No. 97-00171-1-CR-2-JOF), J. Owen Forrester, Judge.

Before CARNES, BARKETT and MARCUS, Circuit Judges.

BARKETT, Circuit Judge:

Vernon Victor Prather appeals his conviction for conspiracy to distribute pseudoephedrine in violation of 21 U.S.C. §§ 861(d)(2) and 846, distribution of pseudoephedrine in violation of 21 U.S.C. § 841(d)(2) and 18 U.S.C. § 2, and money laundering in violation of 18 U.S.C. §§ 2 and 1957(a). Prather asks this Court to discharge him, vacating his conviction and sentence or, alternatively, to grant him a new trial. We affirm Prather's conviction and sentence, with the exception of the imposition of the special assessment.

BACKGROUND

Prather was president and sole stockholder of X-Pressive Looks, Inc. ("XLI"), a Florida-based mail-order corporation with offices in Florida, Georgia, and California. XLI distributed miscellaneous items, including over-the-counter pharmaceuticals. During 1994 and 1995, approximately 80% of XLI's business was derived from the distribution of pseudoephedrine, which is commonly marketed as a nasal decongestant. Pseudoephedrine is also a "listed chemical" under 21 U.S.C. §§ 802(33) and 802(34), and 21 C.F.R. § 1310.02(a)(11), because it can be used as an ingredient to manufacture methamphetamine, a controlled substance. XLI generally distributed pseudoephedrine in cases containing 75 bottles, each containing 1,000 tablets. Between April 1994 and August 1995, XLI distributed more than 830 million tablets of pseudoephedrine to 173 wholesale customers, including several "head shops" and numerous individuals. The

vast majority of those customers lacked business licenses, and many had the pseudoephedrine shipped directly to their home addresses.

At trial, the government presented evidence that, beginning in September 1994, Prather knew from numerous sources that his product was being diverted from the legitimate market for the illegal manufacture of methamphetamine. In addition to other evidence, the jury heard testimony from Alberto Saa that in late 1994 or early 1995, he contacted Prather at XLI about purchasing 100 cases of pseudoephedrine per week, to be shipped to his home address. He testified that Prather informed him that such an arrangement "wasn't a good idea" because the "cops would be hot on" both Prather and Saa, and instructed Saa to buy from one of XLI's "head shop" customers instead.

The government also presented testimony that Prather specifically knew that in 1994 and 1995, several of his customers were investigated by law enforcement agencies and had pseudoephedrine shipments seized by authorities. Prather continued to sell shipments to these customers after the seizure. In May 1995, Prather obtained from a law firm an opinion letter advising Prather that selling millions of pseudoephedrine tablets to small outlets might be considered prima facie evidence of an intent to violate the law. On May 31, 1995, the DEA executed search warrants at XLI's Atlanta offices, seizing, among other items, more than 500 cases of pseudoephedrine. After the search, XLI significantly raised the price of its pseudoephedrine, and its customers continued to buy hundreds of cases. Finally, Prather's sales manager Daniel Matta, who was also indicted, pled guilty to the charges against him and testified against Prather at Prather's trial.

Prather was ultimately convicted of: 1) one count of violating 21 U.S.C. § 846 by conspiring to distribute pseudoephedrine, a listed chemical, knowing or having reasonable cause to believe that the chemical would be used to manufacture a controlled substance; 2) ten counts of violating 21 U.S.C. § 841(d)(2) by actually distributing pseudoephedrine, knowing or having reasonable cause to believe that it would be used to manufacture a controlled substance; and 3) five counts of violating 18 U.S.C. §§ 2 and 1957 by engaging in monetary transactions in criminally derived property in excess of $10,000. He was

sentenced to a 14 year term of incarceration, followed by 3 years of supervised release. He was ordered to pay a fine of $175,000 and a special assessment of $100 for each of the sixteen counts on which he was convicted. Prather appeals his conviction and the imposition of the special assessment.

## DISCUSSION

Prather's convictions for conspiracy and money laundering are predicated on his convictions under 18 U.S.C. § 241(d)(2) for distributing pseudoephedrine knowing or having reasonable cause to believe that the pseudoephedrine would be used to manufacture methamphetamine. Section 841(d) provides that:

> Any person who knowingly or intentionally—... (2) possesses or distributes a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled substance ... shall be fined ... or imprisoned.

Prather challenges his conviction and sentence on several grounds. First, he contends that the government failed to prove that the listed chemicals he sold were actually used to manufacture a controlled substance, which he claims constitutes an element of the crime. Second, he contends that the district court judge's jury instructions were so erroneous as to justify overturning his conviction or granting a new trial. Third, he argues that the judge's refusal to allow the defense to play a previously recorded tape of a government witness during cross-examination violated the Confrontation Clause and the Federal Rules of Evidence. Finally, Prather argues that the trial judge violated the Federal Sentencing Guidelines and the Ex Post Facto Clause by imposing the special assessment as he did. We address each argument in turn.

I.    *Sufficiency of the Evidence to Prove a Violation of the Statute*

The basis of Prather's argument that the evidence presented against him was insufficient to support a conviction is his contention that he cannot be convicted under Section 841(d)(2) until a controlled substance has been produced. Because the government failed to prove that any of the pseudoephedrine he distributed was *actually* used to manufacture methamphetamine, Prather contends that he should not have been convicted on the substantive distribution counts, and therefore on the conspiracy and money laundering counts.

3

In interpreting the meaning of a statute, it is axiomatic that a court must begin with the plain language of the statute. On its face, Section 841(d)(2) criminalizes the distribution of a listed chemical with knowledge that the chemical *will be* used to manufacture a controlled substance. The plain language of the statute requires only knowledge of the present intent to violate the law, not the actual accomplishment of the act. The plain meaning of these words indicates that, in enacting this statute, Congress did not intend to require proof that the controlled substance had actually been manufactured. Rather, the words themselves tell us that the controlled substance in question will not have been manufactured at the moment when the crime is complete. We have found no authority that supports any other reading of the plain language of Section 841(d)(2).

We note that all of our sister courts that have considered the issue have likewise construed Section 841(d)(2). In *United States v. Green,* the Seventh Circuit explicitly rejected, as we do here, a contention identical to Prather's, finding that it was unsupported by either the language of the statute, the statute's legislative history, or any caselaw. *See* 779 F.2d 1313, 1319 (7th Cir.1985). That court instead found that "the plain language of the statute reveals that Congress intended to impose a broad prohibition against the manufacture of [methamphetamine] as well as the possession of [pseudoephedrine] when knowing or having reasonable cause to believe the [pseudoephedrine] would be used to manufacture [methamphetamine]." *Id.* The Fifth and Tenth Circuits have similarly upheld convictions under Section 841(d)(2) where the government has not proved that a controlled substance was actually manufactured from the listed chemical in question. *See United States v. Benbrook,* 40 F.3d 88, 94 (5th Cir.1994) (holding that Section 841(d)(2) "does not require the possessor [of a listed chemical] to be either in the process of manufacturing the drug or presently able to do so to be guilty"); *United States v. Washington,* 858 F.2d 590, 594 (10th Cir.1988) (upholding a conviction based on the government's "theory that the [listed chemical] ... eventually would be used to arrive at [a controlled substance]").

Additional support for this reading of Section 841(d)(2) is provided by precedent from our own Circuit. In *United State v. Hyde,* a panel of this Court held that "[v]iolation of section 841(d)(2) presumes that the final product, the controlled substance, has not yet been manufactured." 977 F.2d 1436, 1439 (11th Cir.1992). Although this language may not precisely answer the question before us, it leans decidedly in the direction of answering that question in the negative. The panel explained that "[t]o violate section 841(d)(2), possession of a precursor chemical must be coupled with the knowledge that it would be manufactured into a controlled substance." *Id.* There is no mention of the need to prove that it was in fact so converted. We conclude that Section 841(d)(2) does not require proof that a listed chemical was actually used to manufacture a controlled substance.

II.      *Jury Instructions*

 We review the legal correctness of a jury instruction de novo, *see United States v. Tokars,* 95 F.3d 1520, 1531 (11th Cir.1996), but defer on questions of phrasing absent an abuse of discretion, *see United States v. Starke,* 62 F.3d 1374, 1380 (11th Cir.1995). Generally, district courts "have broad discretion in formulating jury instructions provided that the charge as a whole accurately reflects the law and the facts," and we will not reverse a conviction on the basis of a jury charge unless "the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process." *United States v. Arias,* 984 F.2d 1139, 1143 (11th Cir.1993) (internal quotation marks omitted). Where a party did not object to a jury instruction in the district court, we review that instruction for plain error. Fed.R.Crim.P. 30, 52(b).

Section 841(d)(2) criminalizes the distribution of a listed chemical when the distributor knows *or* has "reasonable cause to believe" that the chemical will be used to manufacture a controlled substance. In order to find that Prather was guilty under any of the twelve counts charging him with violating the statute, the jury thus needed to find *either* that he knew the pseudoephedrine would be used to manufacture methamphetamine *or* that he had reasonable cause to believe that it would be. Accordingly, the trial judge instructed the jury

5

on both knowledge and "reasonable cause to believe."  Prather challenges both sets of instructions.  When

the jury returned its verdict, it specified in a special verdict that it found Prather guilty under nine counts

because he knew that the pseudoephedrine would be used to manufacture a controlled substance, and under

one count because he had reasonable cause to believe that it would be.

A.      *Instructions Regarding Actual Knowledge*

Under both the statute and binding precedent in this Circuit, the knowledge element of a violation

of a criminal statute can be proved by demonstrating either actual knowledge or deliberate ignorance.  "This

Court has consistently recognized deliberate ignorance of criminal activity as the equivalent of knowledge."

*Arias,* 984 F.2d at 1143 (internal quotation marks omitted).  "The deliberate ignorance instruction is based

on the alternative to the actual knowledge requirement at common law that if a party has his suspicions

aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance, he

is deemed to have knowledge."  *United States v. Rivera,* 944 F.2d 1563, 1570 (11th Cir.1991) (internal

quotation marks omitted).  Although we recognize that the delivery of such an instruction is proper "only in

those comparatively rare cases where ... there are facts that point in the direction of deliberate ignorance," *id.,*

we are satisfied that there was sufficient evidence in this case to warrant an instruction on deliberate

ignorance.  We find no merit to Prather's suggestion that Congress intended to preclude an instruction on

deliberate ignorance by adding "having reasonable cause to believe" as an alternative element of guilt.[1]

B.      *Jury Instruction Regarding Reasonable Cause to Believe*

The jury convicted Prather on Count Seven on the basis of its conclusion that, as to this count, he had

"reasonable cause to believe" that the pseudoephedrine was going to be used for illegal purposes.  Prather

argues that his conviction on this count must be reversed because the jury instructions explaining "reasonable

---

[1]We reject Prather's argument that the ad hoc examples used by the trial judge to illustrate his instructions
on actual knowledge and deliberate ignorance constituted reversible error in this case.

6

cause to believe" were erroneous. Specifically, he argues that the trial court should have instructed the jury that, in order to find him guilty on this basis, they must also find that he acted in bad faith.

In its initial instruction to the jury on "reasonable cause to believe," the trial judge stated that:

[T]he government must show that based on the facts known to the defendant—although not showing actual knowledge of the defendant—based on these facts, these facts would cause a reasonable person knowing those facts to reasonably conclude that the pseudoephedrine was being diverted to the illegal manufacture of a controlled substance.... [T]he question is what would a reasonable person reasonably have believed based on the evidence known to the defendant.

After deliberating for some time, the jury requested further instructions to clarify the standards. In those instructions, the judge attempted to explicate further the "reasonable cause to believe" standard by explaining:

[W]hat it seems to me that it's getting at is requiring people to exercise reasonable or ordinary care in the conduct of a business involving listed chemicals. Here the focus is not on what it is proven that he actually knew. Here the standard is[,] based on what he did know, would a reasonable person, an abstract reasonable person have cause to believe that the pseudoephedrine in the count would be diverted.

Prather urges this Court to find both that the initial instruction was faulty because it failed to include a bad faith requirement, and that the supplemental instruction compounded this error by reducing the "reasonable cause to believe" standard to a negligence standard.

Because Prather failed to object to this instruction at trial, we review for plain error. *See Starke,* 62 F.3d at 1380-81. A reversal based on plain error requires that the challenged instruction be a plainly incorrect statement of the law and:

that it was probably responsible for an incorrect verdict, leading to substantial injustice.... If the instruction will mislead the jury or leave the jury to speculate as to an essential point of law, the error is sufficiently fundamental to warrant a new trial despite a party's failure to state a proper objection.

*Montgomery v. Noga,* 168 F.3d 1282, 1294 (11th Cir.1999) (internal quotation marks and citation omitted). Under the facts of this case, we cannot say that the instructions would be "probably responsible for an incorrect verdict, leading to substantial injustice." *Id.* There was overwhelming evidence showing that Prather had actual knowledge of the illegal purposes for which his product was used. Indeed, the jury found him guilty on this basis with respect to nine counts of the indictment. Based upon this record, and in light of the

7

jury verdicts finding knowledge during the time frame both before and after the conduct charged in Count Seven, we find that there was no plain error in instructing the jury.

III.   *Exclusion of Taped Testimony*

Finally, Prather contends that the district court erred in refusing to allow him to use a tape-recorded conversation in his cross-examination of government witness Matta either as impeachment evidence or to refresh Matta's recollection. The district court refused to admit the tape recording in evidence because Prather had violated the Rule 16 pre-trial discovery order by neglecting to disclose the existence of the tape to the prosecution. We note initially that Prather neither sought an opportunity to permit Matta to review the recorded testimony privately to refresh his recollection, nor made the trial judge aware that this was the nature of his objection. Rather, he sought only to play the tape in question before the jury. Based on this record, we conclude that the district court judge did not abuse his discretion by excluding the tape recording as a sanction for failing to comply with the discovery order. Moreover, even if the judge abused his discretion by failing to allow the evidence for the purpose of refreshing Matta's recollection, the error did not affect Prather's substantial rights or violate Prather's Confrontation Clause rights. "A defendant's confrontation rights are satisfied when the cross-examination permitted exposes the jury to the facts sufficient to evaluate the credibility of the witnesses and enables defense counsel to establish a record from which he can properly argue why the witness is less than reliable." *Mills v. Singletary,* 161 F.3d 1273, 1288 (11th Cir.1998). Prather had ample opportunity, which he utilized, to impeach Matta's credibility by, among other methods, eliciting both testimony about Matta's plea agreement with the government, and admissions that Matta "may have" made statements to investigators and government agents attesting to Prather's law abiding nature. The jurors had sufficient cross-examination testimony and evidence before them to enable them to judge the credibility of Matta as a government witness.

IV.   *Special Assessment Amount*

8

Both parties agree that the district court erred in levying a special assessment of $100 per count against Prather pursuant to 18 U.S.C. § 3013(a)(2)(A). The statutory special assessment amount for the crimes of which Prather was convicted was raised from $50 to $100 for offenses taking place on or after April 24, 1996. Although Prather was convicted after that date, all of the offenses of which he was convicted were committed prior to that date. Because the Ex Post Facto Clause of the Constitution forbids retroactive application of criminal sanctions, we vacate the special assessment and remand for recalculation at the rate of $50 per count.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED for recalculation of the special assessment.