[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 27, 2005
THOMAS K. KAHN
CLERK

No. 03-16487

D. C. Docket No. 03-00070 CR-1-CB

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROBERT J. WARHURST, JR.,

Defendant-Appellant.

_____

No. 04-10754

_____

D. C. Docket No. 03-00070-CR-1-CB

UNITED STATES OF AMERICA,

Plaintiff-Appellant
Cross-Appellee,

versus

ROBERT J. WARHURST, JR.,

Defendant-Appellee
Cross-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Alabama

_____

**(May 27, 2005)**

Before EDMONDSON, Chief Judge, DUBINA and HULL, Circuit Judges.

PER CURIAM:

A jury convicted Defendant-Appellant Warhurst of violating federal drug laws 21 U.S.C. §§ 841(c)(2) and 846. The district court charged the jury with a deliberate ignorance instruction and downwardly departed for the sentence. Warhurst appeals the jury instruction, and the Government cross-appeals the downward departure. On both issues, we affirm.[1]

### FACTS

Warhurst owned and served as the pharmacist of a drug store located near Mobile, Alabama. During the course of 2000 and 2001, several persons purchased

---

[1] This case initially was consolidated with the Government's appeal of one of Warhurst's co-defendants, Wells. In the interim between the trial and the oral argument in this case, Wells died. We granted the Government's unopposed motion to vacate Wells's conviction. Wells's case does not affect this one.

large quantities of over-the-counter pseudoephedrine, like and including the decongestant Sudafed. Often the large quantities were used to manufacture the illegal drug, methamphetamine.

For example, over the course of four months, James Harrell said he purchased about $60,000 to $80,000 worth of pseudoephedrine. The individual purchases were significant: $150 each on the first and second day he bought, $350 the following day, and so on almost every day for the four months.[2]

Byron Jones purchased thirty-five packages of pseudophedrine from Warhurst's store in the fall of 2000. Jones's usual practice was to purchase around 200,000 to 300,000 mg of pseudoephedrine per week from Warhurst, costing Jones about $200 to $400 each time. From time to time, one of Warhurst's employees (not Warhurst) informed Jones when the next shipment of pseudoephedrine would arrive. On the expected day, Jones would often wait outside the store for the truck's arrival. His purchases totaled $7000 to $8000.

Beginning in the spring of 2001, Vicki Carr also made substantial purchases at Warhurst's store. The first day she purchased "everything off the shelf," costing her about $100. She repeated this conduct about ten or twelve times, and she also ordered large quantities of pseudoephedrine through the pharmacy an additional

---

[2] Harrell testified that, if he was not personally in the store, he "would have somebody go."

five to seven times.  Carr estimates that, in total, she spent approximately $1500 to $1600 at Warhurst's pharmacy from the spring of 2001 through 8 September 2001. Mrs. Carr's husband, Cecil Carr, also began purchasing psuedoephedrine from Warhurst's pharmacy in 2000.  He purchased thirty boxes the first time he entered.  He repeated this twelve times over the year, causing him to spend between $1000 and $1100 at Warhurst's store.  The jury also heard testimony from other witnesses who purchased $200 of pseudoephedrine over a two-week period.

As the police began arresting these persons, the police focused on Warhurst's store.  On 12 August 2002, Mobile Police Officer Chad Roberts entered Warhurst's store undercover.  He asked Warhurst if the twelve boxes on the shelf were all the Sudafed that Warhurst had.  Warhurst answered affirmatively, and Roberts bought the twelve boxes and an additional nine boxes of different pseudoephedrine products.  Roberts returned four days later.  That day he purchased approximately twenty-six boxes of pseudoephedrine medicine. These purchases totaled about $300.  About nine days later, Roberts purchased an additional $337 worth of pseudoephedrine products.  In September, Roberts made two more controlled buys of pseudoephedrine products: one on 9 September totaling $118, and two on 11 September totaling $403.

Later, Officer Roberts used another tactic: explaining to the clerks (not Warhurst) how much money he had and saying that he wanted to purchase as much Sudafed as the amount would permit. Warhurst's employees obliged. Roberts purchased $1000 worth on 17 September; $400 on 14 January.[3]

As part of the same task force as Officer Roberts, Officer Barker of the Saraland Police also made a controlled buy on 17 September 2002. He purchased $856 worth of Sudafed. The Government also produced evidence documenting that Warhurst's store sold significantly more pseudoephedrine products than other stores in the surrounding area.

At least one of Warhurst's employees, the cashier, Rhonda McInvale, also testified. She explained that Warhurst knew about the money that came into the store during each business day. McInvale said that Warhurst often kept $500 to $1000 in cash and gave her the remaining checks to deposit.

As Warhurst points out, however, none of the purchaser-witnesses told Warhurst about their illicit plans for the Sudafed. So the Government offered circumstantial evidence of proof of Warhurst's knowledge. From the buyers, the Government elicited this kind of testimony: (1) James Harrold's statement that

---

[3] On this day, Officer Roberts also pre-ordered a case, leaving his cell phone number with the clerk so she could notify him of its arrival.

Warhurst told him to purchase his $350 worth of Sudafed at the front of the store, opposite from where Warhurst worked; (2) Byron Jones's recollection that when Warhurst's store had no Sudafed, Warhurst told him to call a certain employee or return on Tuesday or Thursday when the orders arrived; (3) Cecil Carr's description of Warhurst as being near the register when Carr purchased the large quantities; (4) Chad Roberts testimony that Warhurst was in the store each time he purchased pseudoephedrine, and that Roberts collected the large quantities of the product no more than five yards from Warhurst whenever he made a purchase; and (5) John Barker explained that he made eye contact with Warhurst after taking at least twenty boxes of Sudafed off the shelf near Warhurst, and after posing his body so that Warhust could see him taking the individual boxes one-by-one.

The Government also elicited testimony from the Executive Director of the Alabama Board of Pharmacy. He testified that all registered Alabama pharmacists like Warhurst received newsletters from at least November 1994 through 2002 that placed them on notice to watch for excessive purchases of pseudoephedrine and ephedrine. A compliance coordinator with the pharmaceutical wholesale distributer that sold Sudafed to Warhurst's store testified as well. He recalled speaking to whom he believed to be the pharmacist at Warhurst's store. According to his testimony, the compliance coordinator told the pharmacist that

6

the distributor planned to limit the quantities sold to Warhurst's store because the level of pseudoephedrine purchases by the store reached suspicious levels. The coordinator further described that pharmacist's reaction as being upset that the distributor would limit the sales.

Last, McInvale testified to a conversation she had with Warhurst that a jury could believe established his knowledge: "On one occasion when I put some money in his register he [Warhurst] made the remark that he didn't think we were busy the day before. And I told him that I put eighteen hundred dollars in there from our register from the Sudafed sales and he didn't say anything."

At trial, Warhurst's main defense was that he did not know the purchases were excessive or illegal. He argued that any conspiracy or knowledge of suspicious activity resided with the store clerks who rang up the purchases. And over Warhurst's objection, the district court gave a deliberate indifference instruction on the knowledge element of the crime:

> Now, when knowledge of the existence of a particular fact is an essential part of a defense, such knowledge may be established if the defendant is aware of a high probability of its existence. Unless the defendant actually believes that it does not exist. So with respect to the issue of the defendant's knowledge in this case, if you find from the evidence beyond a reasonable doubt that the defendant believed that pseudoephedrine, a listed chemical, sold by his employees was being used to manufacture methamphetamine,

7

deliberately and consciously tried to avoid learning that the pseudoephedrine was being used for this purpose in order to be able to say if apprehended that he did not know the pseudoephedrine being sold by his employees was being used to manufacture methamphetamine, you may trat such deliberate avoidance of positive knowledge as the equivalent of knowledge.

In other words, you may find that a defendant acted knowingly if you find beyond a reasonable doubt either, one, that the defendant actually knew or had reasonable cause to believe that pseudoephedrine was being used to manufacture methamphetamine or, two, that he deliberately closed his eyes to what he had every reason to believe were the facts. I must emphasize however, that the requisite proof of knowledge on the part of the defendant cannot be established by merely demonstrating that the defendant was negligent, careless, or foolish.

The jury disagreed with Warhurst's defense. It returned a guilty verdict on all ten counts: one for conspiracy to possess pseudoephedrine with intent to manufacture methamphetamine, 21 U.S.C. § 846, and nine for possession of pseudoephedrine with intent to manufacture methamphetamine, 21 U.S.C. § 841(c)(2).

Based on Warhurst's convictions, the United States Sentencing Guidelines imposed a range of imprisonment from 235 to 293 months. The trial court initially sentenced Warhurst (based only on counts one, three and ten) to forty-eight months in prison and supervised release thereafter. In addition, the court imposed fines totaling $25,300. The district court cited several reasons for its downward

8

departure: (1) falling outside the heartland; (2) that Warhurst would not survive an imposition of the full sentence; (3) other employees "who were arguably equally as culpable" were not prosecuted;[4] and (4) that, at the time of sentencing, Warhurst was advanced in age (seventy-two), and his physical health was poor.[5]

On appeal, Warhurst challenges the use, but not the wording, of the deliberate ignorance charge. The Government cross-appealed, arguing that the district court erred by granting Warhurst the downward departure.

DISCUSSION

1. *The Deliberate Ignorance Charge*

Warhurst argues that insufficient evidence supported the use of the deliberate ignorance instruction. He does not challenge the wording of the instruction or that it can sometimes be used.[6] We review the legal correctness of a

---

[4]   The district court did not cite this reason in its published report.

[5]   The district court explained that Warhurst submitted his medical record into evidence. The record indicates that he suffered from various ailments, including arthritis, peptic ulcers, diabetes, hypertension, bulging disk in the spine, and heart disease. It held a resentencing hearing on 5 February 2004 to add the additional counts, but the court imposed the same sentence. In the resentencing, the trial judge said that he imposed the sentence to meet the objectives of "punishment, deterrence and incapacitation."

[6]   By the way, that argument is foreclosed by United States v. Prather, 205 F.3d 1265, 1270 (11th Cir. 2000) (upholding use of deliberate ignorance instruction for 18 U.S.C. § 841(3)(2)

decision to charge the jury with particular instruction de novo.  United States v.

Prather, 205 F.3d 1265, 1270 (11th Cir. 2000) (citation omitted).  Like the panel in

Prather, we say that courts should apply the deliberate ignorance instruction "'only

in those comparatively rare cases where . . . there are facts that point in the

direction of deliberate ignorance.'" 205 F.3d at 1270 (ellipsis in original) (citing

United States v. Rivera, 944 F.2d 1563, 1570 (11th Cir. 1991)).

Prather addressed similar facts to those here.  The defendant was the

president of a mail-order corporation that distributed over-the-counter

pharmaceuticals, including pseudoephedrine.  205 F. 3d at 1268.  Facts

demonstrated he had some knowledge that the pseudoephedrine would eventually

be used to manufacture methamphetamine.  These facts included that the

defendant turned down a request to sell one hundred cases of pseudoephedrine to

an person's home because, according to the defendant, "the 'cops would be hot on'

both [the defendant and buyer]."  Id.  The jury also heard evidence that Prather

knew for about a year that "several of his customers" were under investigation for

drug related activities, but Prather continued to sell them pseudoephedrine.  Id.

Also, an attorney warned Prather that his sales "might be considered prima facie

_____

conviction).

10

evidence of an intent to violate the law." Id. Accordingly, this Court concluded sufficient evidence warranted the instruction. Id. at 1270.

In Rivera, we said that the government did not provide sufficient evidence to warrant the deliberate ignorance instruction. 944 F.2d at 1572. There, the Government seized the suitcases of three inbound passengers from Columbia. The Government provided no evidence that the passengers knew the suitcases were altered (false bottoms) and contained cocaine, nor did the Government establish that anyone gave the defendants the suitcases for delivery. Id.

In the present case, we conclude the district court did not err by giving the deliberate ignorance instruction. True, the Government produced more compelling evidence in Prather. And "[t]he danger of overly liberal use of such an instruction in an inappropriate case is that juries will convict on a basis akin to a standard of negligence: that the defendant *should* have known that the conduct was illegal." Rivera, 944 F.2d at 1570 (emphasis in original). But sufficient evidence existed here to allow the charge.

As the store owner, Warhurst handled all the money and very likely knew of the increased sales.[7] In addition, he was in the store for the vast majority of the

---

[7] McInvale's testimony about the $1800 supports the link between increased sales and Sudafed purchases.

major purchases and physically near the Sudafed. Moreover, Warhurst facilitated Byron Jones's excessive purchases by telling him when the orders arrived. This evidence satisfies that Warhurst knew persons were purchasing significant amounts of pseudoephedrine.

To show Warhurst's knowledge that the purchasers would likely use the drug illegally, the Government produced pharmacy newsletters warning of excessive purchases being linked to methamphetamine production. And, the call from the compliance coordinator indicates that Warhurst knew such mass sales were a problem. This evidence supports "the inference that the defendant was aware of a high probability of the existence of the fact in question." United States v. Alvarado, 838 F.2d 311, 314 (9th Cir. 1987). The instruction was proper.

2. *Sentencing Issues.*

After the benefit of oral argument and our review of the record, we decide that the Government's cross-appeal lacks merit. Accordingly, on both the conviction and the sentence imposed, the district court is affirmed.[8]

AFFIRMED.

---

[8] Warhurst moved to amend his brief to substitute the following conclusion: "The appellant respectfully moves this Honorable Court to reverse his conviction and sentence, grant him a new trial or remand the case to the district court for resentencing." We deny that motion. Even if we granted the motion, we conclude that it has no substantive impact on our resolution of this case.