[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-15054
Non-Argument Calendar
_____

D.C. Docket No. 1:10-cr-00397-WSD-LTW-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BIDEMI BELLO, a.k.a. Ola Williams,
a.k.a. Abidemi A. Bello,
a.k.a. Nimota Folashade Bello,
a.k.a. Wasilat O. Williams,
a.k.a. Bidemi A. Bello,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(October 19, 2012)

Before DUBINA, Chief Judge, TJOFLAT and KRAVITCH, Circuit Judges.

PER CURIAM:

Following her convictions for two counts of forced labor, two counts of trafficking with respect to forced labor, one count of document servitude, one count of harboring for financial gain, and two counts of unlawful procurement of naturalization, Appellant Bidemi Bello challenges the two forced labor convictions, raising an issue regarding the Sixth Amendment right to a unanimous jury verdict. Bello argues that the district court erred in refusing to instruct the jury that it must find unanimously the unlawful means by which she coerced her two victims into forced labor. After considering the record and the arguments of the parties, we affirm the convictions.

## I.

### A. Facts

Bello, who emigrated to the United States, took trips to her native country, Nigeria, where she recruited two teenage girls to work for her as nannies through false promises of a better life in America. In both situations, Bello brought the girls into the United States illegally and made the girls her domestic slaves by means of physical abuse, psychological abuse, and various threats. While the maltreatment of each victim was very similar, our analysis requires that we

separately recount the testimony and evidence concerning each young woman.

### 1. Laome's Forced Labor

First, Bello recruited Olawunmi Olatunbosun ("Laome"), a 17 year old from a very poor family in Nigeria.[1]  Laome spoke no English.  Bello promised Laome and her father that if Laome worked as Bello's nanny, Bello would pay her a monthly salary, send money to the family in Nigeria, and allow Laome to attend school in America.  Bello brought Laome to the United States illegally in October 2001 where she lived with Bello in a large home outside of Atlanta.

Bello required Laome to cook, clean, and complete daily household chores in addition to caring for T., Bello's baby.  Bello denied Laome access to available tools at the home that would speed her work, such as a lawnmower, vacuum cleaner, washing machine, or dishwasher.  Instead, Bello required Laome to cut the grass by hand, sweep the carpet with a broom, and hand-wash dishes, clothes, and diapers.  Bello demanded that Laome clean the bathrooms and a backyard fence daily, regardless of whether they were dirty.  Laome did these tasks while simultaneously caring for T; thus, Laome often carried the baby with her on her back.  Laome was also responsible for caring for T. during the night if T. cried.  If

---

[1] The superseding indictment identifies Olawunmi Olatunbosun as "O.O."  Trial transcripts and the jury instructions refer to her by the nickname "Laome," which we also adopt for ease of reference.

Laome permitted T. to cry, Bello would beat Laome. When she was at home, Bello never contributed to household upkeep or the care of her child. Over the two and a half years that Laome worked for Bello, Bello never paid her directly, although she did send a total of $300 to Laome's parents. Laome never attended school as Bello promised.

Bello secured Laome's obedience and labor by abusing Laome and threatening her. If household chores did not satisfy Bello, she hit and beat Laome with the back of her hand, a shoe, a wooden spoon, an extension cord, a belt, a hanger, a broom, or any item close at hand. On occasion, Bello stood on Laome's stomach while beating her. She also threatened to beat and kill Laome or send her to jail in Nigeria. Bello told Laome that if she answered the door or talked to the neighbors, the police would take Laome to jail. Laome believed all of Bello's threats. Bello further abused Laome by calling her dumb, stupid, poor, dirty, ugly, demonic, a slave, a witch, and a bitch. Bello took Laome with her to her church and told her church pastor that Laome was a witch.

Bello required Laome to sleep on the couch, even though the home had extra bedrooms. Bello forbid Laome from using any of the home's bathtubs, and instead, required Laome to bathe with a bucket. Bello dressed Laome in her old clothes and underwear, cut her hair short against her wishes, and gave her no

4

privacy, requiring her to change clothes in a hallway near a closet where Laome kept her belongings. Bello did not feed Laome well and often forced her to eat old, moldy food. If Laome threw up the food, Bello made her eat her vomit.

Laome could not go and come from the house as she pleased. She had no cell phone, keys to Bello's home, or personal money. Laome made no friends of her own in the United States. After Laome told Bello that Laome's father called the house, Bello beat and kicked her for hours and forced her to stand naked for a day with one hand and one foot on the ground and the other foot in the air. Eventually, in May 2004, Laome escaped Bello's home with the assistance of two of Bello's friends who observed the abuse.

### 2. Dupe's Forced Labor

After Laome's escape, Bello needed someone else to care for her home and T., so she returned to Nigeria and recruited Olayemia Shorinola ("Dupe").[2] Dupe also came from modest means, but she knew a little English from school. Again, Bello promised Dupe's father that she would treat Dupe like family and put her through school in America in exchange for Dupe's care for T., who was then about three years old. Bello also told Dupe's father that Dupe would be expected to help

---

[2] The superseding indictment identifies Olayemia Shorinola as "O.S." Trial transcripts and the jury instructions refer to her by the nickname "Dupe," which we also adopt for ease of reference.

out around the house a little. Dupe's care for T. was intended to be rendered in exchange for Bello's providing Dupe with an education. Bello used false information and documents to bring Dupe illegally into the United States in the fall of 2004.

Upon arrival at Bello's home, Bello put Dupe to work and required her to constantly busy herself with housework, yard work, and childcare. Dupe usually began working around 5:00 in the morning and was not permitted to rest or have a day off. If T. woke up during the night, Dupe had to care for her. Bello did no childcare or chores herself. As with Laome, Dupe was not allowed to use available appliances for her chores. Once, when Bello learned that Dupe used the washing machine and caused it to malfunction, Bello slapped her.

Bello frequently slapped, hit, beat, and cursed Dupe. She insulted Dupe's family, called her stupid, a witch, and a slave. When Dupe fled from Bello's abuse, Bello would just corner her against a wall and then beat her more. More than once, Bello caused Dupe to bleed. Usually the beatings were for what Bello deemed unsatisfactory job performance, but at other times, Bello beat Dupe for accidents and mistakes, or for standing up for herself by talking back to Bello. Dupe showed marks on her face to people at Bello's church and told them that Bello beat her.

6

Dupe was required to sleep on the floor and bathe with a bucket, even though the house had spare bedrooms and bathrooms. Bello forced Dupe to cut her hair short, against her wishes. Dupe could not eat the food she prepared for Bello; rather, Bello bought Dupe cheap foods that were about to expire. On one occasion, Bello forced Dupe to eat spoiled leftovers.

Like Laome, Dupe was not given a key to the house or a cell phone. She could not go outside without Bello's permission. Bello tried harder to isolate Dupe than she tried with Laome, forbidding Dupe from speaking to people at her church. Like Laome, Dupe had no other contacts in America, and Bello did not allow Dupe to contact or be contacted by her family in Nigeria. Dupe did not believe there was anything she could do about her situation. Dupe believed that Bello had powerful friends in government in Nigeria who could have her or her parents arrested. As with Laome, Bello told Dupe that American law enforcement would put Dupe in jail or send her back to Nigeria if she ever called the police.

Bello never paid Dupe or her family, and she never sent Dupe to school as promised. Eventually, in the spring of 2006, Dupe escaped Bello's home, using money given to her by Bello's friends to call a taxi.

**B. Relevant procedural history**

Bello was arrested in August 2010. A grand jury indicted Bello on nine

7

counts, two counts of which were for the forced labor of Laome (Count One) and Dupe (Count Four).  Counts One and Four of the superseding indictment charged that Bello, in violation of 18 U.S.C. § 1589, knowingly obtained the labor and services of both victims: (1) by means of threats of serious harm to and physical restraint against the victims or another person; (2) by means of a scheme, plan, and pattern intended to cause the victims to believe that, if they did not provide labor or services, they or others would suffer serious harm; and (3) by means of the abuse and threatened abuse of the law and legal process.[3]  Bello's case proceeded to trial.

At the charging conference, and later in writing, Bello objected to the Government's proposed instruction describing the elements of forced labor to be proved on Counts One and Four.  Bello argued that the jury must be instructed to unanimously agree as to the prohibited means by which she obtained Laome and Dupe's labor.  The court overruled the objection, which she renewed after the jury was charged.  The jury found Bello guilty on eight of nine counts charged, including Counts One and Four.  The district court sentenced Bello to a term of

---

[3] The superseding indictment, the Government's requested jury instructions, and the jury charge all follow the original version of 18 U.S.C. § 1589, in force from 2000 to 2008.  We also reference the original, 2000 version of the statute in effect prior to the 2008 amendments, as this statute was in effect at the time of Bello's offense conduct.

8

imprisonment of 140 months on Counts One, Two, Four, and Five; 120 months on Counts Seven, Eight, and Nine; and 60 months on Count Three, all to run concurrently for a total of 140 months' imprisonment.  Upon her release from prison, Bello will serve three years' supervised release.  Bello was also ordered to pay restitution in the amount of $144,200.  Bello timely appealed, contesting the jury instructions' failure to require unanimity as to the means by which Bello coerced Laome and Dupe to work.

## II.

We review the legal accuracy of a jury instruction *de novo*.  *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000).  However, we review for an abuse of discretion a district court's rejection of a requested jury instruction.  *United States v. Moore*, 525 F.3d 1033, 1046 (11th Cir. 2008).

## III.

On appeal, Bello reiterates her objection to the jury's instruction on the forced labor offenses.  Bello contends that, pursuant to her Sixth Amendment right to a jury trial and a unanimous jury verdict, the court should have required the jury to unanimously find not only that she coerced Laome and Dupe into forced labor by some prohibited means, but also the specific statutory means by which she obtained their labor.  She further contends that because Counts Two, Three, and

9

Five include as an element the underlying violation of the forced labor statute, her conviction on these counts also must be reversed. Similarly, she argues that Count Eight must be reversed because it required a finding that Bello was not entitled to naturalization as a U.S. citizen at the time she sought naturalization because she committed a crime for which she had not been arrested, i.e., the crime of forced labor.

The Government counters that the three means of coercion identified in the statute are not elements of the offense of forced labor. Rather, coercion, by any, some, or all of the three means, is the element that requires a unanimous jury verdict, and the jury was adequately instructed to find unanimously that Bello knowingly obtained forced labor by at least one of the means identified in the statute. The Government contends that the statutory text, legislative history, and narrow scope of conduct encompassed in 18 U.S.C. § 1589 compel the conclusion that the methods of coercion listed in the statute are simply means, not individual elements of the forced labor crime. Alternatively, the Government argues that even if the instruction given was erroneous, any error was harmless because the Government presented overwhelming evidence that Bello coerced her victims by all three of the enumerated methods of coercion.

The statute in dispute, 18 U.S.C. § 1589(a), states that

10

[w]hoever knowingly provides or obtains the labor or services of a person—

> (1) by threats of serious harm to, or physical restraint against, that person or another person;

> (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or

> (3) by means of the abuse or threatened abuse of law or the legal process,

shall be fined . . . or imprisoned . . . , or both.

Consistent with the text of the statute, the district court instructed the jury on Counts One and Four as follows:

> To find a Defendant guilty of forced labor, you must find that the Government has proven each of the following three elements beyond a reasonable doubt:

> First, that the Defendant provided or obtained the labor or services of another person.

> Second, *that the Defendant did so through at least one of the following prohibited means*:
> One, by threats of serious harm to, or physical restraint against the person or any other person;
> Or, two, by a scheme, plan or pattern intended to cause the person to believe that non-performance of labor or services would result in serious harm to that person or any other person;
> Or three, by the abuse or threatened abuse of law or the legal process.

11

And thirdly — this is the third element — that the defendant acted knowingly.

. . .

*If you find that the defendant used one of the prohibited means*, you must then determine whether such use was sufficient to cause [either victim] reasonably to believe that she had no choice but to remain working for the defendant.

[R. 81 at 1154–56 (emphasis added).] The court also instructed the jury generally that "[a]ny verdict you reach in the jury room, whether guilty or not guilty, must be unanimous. In other words, to return a verdict, you must all agree." [*Id.* at 1169.]

It is clear that "a jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved *each element*" of the crime charged. *Richardson v. United States*, 526 U.S. 813, 817, 119 S. Ct. 1707, 1710 (1999) (emphasis added). It is unclear, however, whether the means of coercion in § 1589 should be treated as elements of a forced labor offense, requiring a jury's unanimous agreement as to which means of coercion were employed. The question presents an issue of first impression in this circuit or any federal circuit. Nevertheless, we will not resolve the issue in this instance because we are confident that even if the district court committed a constitutional error, the error was harmless.

12

Where we have previously analyzed a district court's failure to give a unanimity instruction, we've applied harmless error doctrine "if . . . the court's conviction is sure that the error did not influence, or had but very slight effect" on the verdict. *Ross v. United States*, 289 F.3d 677, 683 (11th Cir. 2002) (per curiam) (internal alterations and quotation marks omitted) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 437, 115 S. Ct. 992, 995 (1995)). "But if [we are] in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless." *Ross*, 289 F.3d at 683 (internal quotation marks and citation omitted).

The record before us indicates that the verdicts on Counts One and Four would not have likely differed if the court instructed the jury to find unanimously the means by which Bello coerced Laome and Dupe to work for her. The Government presented evidence that: (1) Bello both threatened to beat and actually beat both Laome and Dupe; *and* (2) Bello engaged in a persistent pattern of abuse of both Laome and Dupe that led them to believe that disobeying Bello would result in continued, and possibly more serious, abuse; *and* (3) Bello threatened to subject both Laome and Dupe, or their families, to arrest and imprisonment in the United States, Nigeria, or both. Congress defined forced labor as knowingly obtaining a person's labor through at least *one* prohibited

13

means of coercion.  *See* 18 U.S.C. § 1589(a).  Therefore, no "grave doubt" exists as to whether the jury might have failed to unanimously agree that Bello employed at least one prohibited statutory means of coercion when the Government demonstrated Bello's use of all three prohibited means.  *See Ross*, 289 F.3d at 683. Furthermore, because the verdicts on Counts One and Four were unaffected by the court's instructions, any error was likewise harmless as to Bello's other convictions that included as an element a violation of the forced labor statute.

Consequently, we hold that even if the district court's instruction was insufficient insofar as it did not require unanimity as to the prohibited means of coercion, any error was harmless.  Likewise, we conclude that the district court's rejection of Bello's requested jury instruction was not an abuse of discretion.

## IV.

For the foregoing reasons, we affirm Bello's convictions as to Counts One and Four, the substantive forced labor offenses, and as to Counts Two, Three, Five, and Eight, the counts that Bello argues are dependent upon the guilty verdict as to Counts One and Four.

**AFFIRMED.**

14