[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 13, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-11212
Argument Calendar

_____

D. C. Docket No. 04-14020-CR-DLG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DONALD FRANK MINTMIRE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(November 13, 2007)**

Before DUBINA and MARCUS, Circuit Judges, and PROCTOR,* District Judge.

PROCTOR, District Judge:

---

*The Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

Donald Frank Mintmire ("Mintmire"), a licensed attorney, appeals his conviction on Counts One and Three of a third superseding indictment returned against him. With respect to Count One, Mintmire was convicted of violating 18 U.S.C. § 1512(c)(2) by attempting to obstruct a grand jury investigation in Florida related to the sale of stock in Clements Golden Phoenix Enterprises, Inc. ("Clements"). As to that count, the Government presented evidence that Mintmire had participated in several recorded conversations with Kevin Bell, an unknowing shareholder, officer, and director of Clements who had been subpoenaed to testify before a federal grand jury on matters involving his knowledge of Clements. With respect to Count Three, Mintmire was convicted under 18 U.S.C. § 371 and 18 U.S.C. § 1505 of conspiring to obstruct a Securities and Exchange Commission ("SEC") investigation concerning cMeRun, an internet start-up company, the predecessor of which Mintmire had organized. As to that count, the Government presented evidence that Mintmire had conspired with Keith Logue, his former law firm partner, to encourage Mary Catherine McGowan, another unknowing shareholder, to withhold documents in response to an SEC subpoena in the investigation of cMeRun. After thorough review, we affirm Mintmire's convictions.

## I. BACKGROUND

### A.    Procedural History.

In May 2004, after a search of Mintmire's law office in Florida, the Government unsealed a one-count indictment charging him with a violation of 18 U.S.C. § 1512(c)(2)[1] for attempted obstruction of a federal grand jury investigation into the sale of corporate stock of Clements, a corporation that Mintmire had represented.  The indictment alleged that from August to September 2003, Mintmire attempted to dissuade grand jury witness Kevin Bell ("Bell") – and also encouraged Bell to dissuade others – from disclosing facts concerning the formation of Clements through the merger of Lucid Concepts, Inc. ("Lucid") and Clements Citrus Sales of Florida, Inc. ("Citrus").

On August 5, 2004, the Government filed a superseding indictment, adding a second count against Mintmire charging him with violating 18 U.S.C. § 1505[2] by

---

[1]18 U.S.C. § 1512(c)(2) states in relevant part: "Whoever corruptly— . . . (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts  to do so, shall be fined under this title or imprisoned not more than 20 years, or both."  18 U.S.C. § 1512(c)(2).

[2]18 U.S.C. § 1505 states in relevant part:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States . . .

obstructing a 2002 Boston SEC proceeding related to cMeRun, Inc., a company

formed from another company that Mintmire had represented, Fundae Corp.

("Fundae").  Specifically, the new count charged Mintmire with attempting to

conceal his control of the companies' shares by failing to produce subpoenaed

documents to the SEC and by falsely testifying in his deposition regarding

common shareholders of the two companies and Mintmire's alleged loans to those

shareholders.

Thereafter, Mintmire moved to dismiss Count Two on the ground that the

Southern District of Florida was not the proper venue to prosecute him for

obstruction of the Boston-based SEC proceeding.  In an apparent response to the

venue issue, the Government amended Count Two to allege a violation of 18

U.S.C. § 1512(c)(2), instead of § 1505, which allowed it to take advantage of the

venue provision contained in 15 U.S.C. § 1512(i).[3]  The Government further

_____

        Shall be fined under this title, imprisoned not more than 5 years . . . or
both.

18 U.S.C. §1505.

    [3]Section 1512(i) states in relevant part:

(i) A prosecution under this section . . . may be brought in the district in which the
official proceeding (whether or not pending or about to be instituted) was
intended to be affected or in the district in which the conduct constituting the
alleged offense occurred.

15 U.S.C. § 1512(i).

modified Count Two to allege that Mintmire had paid attorneys representing persons subpoenaed by the SEC while withholding documents from those attorneys and their clients and Count One to allege that Mintmire attempted to dissuade Bell from disclosing that shareholders in Lucid (prior to the merger) and Clements (after the merger) were nominee shareholders.[4]

After Mintmire renewed and amended his motion to dismiss Count Two for lack of venue, the district court referred the venue issue to Magistrate Judge Frank J. Lynch, who recommended that Mintmire's venue motion be denied. Mintmire also moved to dismiss Count Two and asserted that it violated the Ex Post Facto clause of the U.S. Constitution because § 1515(c)(2) did not become effective until after Mintmire produced documents and was deposed in the SEC proceeding.

On December 9, 2004, the Government added a third count charging Mintmire with violating 18 U.S.C. § 371[5] and § 1505 by conspiring to obstruct the

---

[4]Specifically, the indictment alleged that Mintmire asked Bell: (1) to assist him in determining which shareholders the investigators wished to interview; (2) to encourage shareholders not to speak to investigators voluntarily; and (3) to tell shareholders to omit or downplay the role of his son, Mark Mintmire.

[5]18 U.S.C. § 371 states in relevant part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both. . . .

18 U.S.C. § 371.

SEC proceeding in order to hide the fact that Fundae shareholders were really nominees who had given control of their stock to Mintmire. According to the Government, Mintmire committed the following overt acts in furtherance of the conspiracy in September and October 2002 in the Southern District of Florida: (1) Mintmire contacted, agreed to pay, and paid Keith Logue ("Logue"), an attorney in Atlanta, Georgia, to make unsolicited contact with persons subpoenaed by the SEC; (2) Mintmire falsely informed SEC counsel that he had provided all relevant subpoenaed documents while failing to provide documents in his possession to a nominee shareholder; and (3) Mintmire misrepresented to the SEC his relationship with the nominee shareholders, the common shareholders of Fundae and Clements, and investment loans made to shareholders.

Mintmire then moved to dismiss both Counts Two and Three as motivated by "prosecutorial vindictiveness" in an attempt to punish Mintmire for the exercise of his constitutional and statutory rights and alternatively, to sever Counts Two and Three from Count One on the basis that the Government sought to take advantage of prejudicial spillover by trying all three counts together.

All three counts were tried in the district court from January 31 until February 8, 2005. After the close of evidence, the district court dismissed Count Two as violative of the Ex Post Facto clause. However, the court denied

Mintmire's motion for a judgment of acquittal on Count One, and it permitted

Count Three to go forward on the theory that Mintmire had conspired with Logue

to obstruct the SEC proceeding.[6]

During the charge conference, Mintmire requested that the court instruct the

jury that the Government had the burden to prove beyond a reasonable doubt that

"[t]he Defendant was not providing lawful, *bona fide*, legal representation in

connection with or anticipation of an official proceeding," while the Government

requested that the jury be instructed that it must first find that Mintmire was acting

as a lawyer before any burden shifted onto the Government. The district court

expressed uncertainty as to whether the issue was a factual question for the jury or

a legal question for the court. However, the court ultimately decided, and

instructed the jury accordingly, that the jury had to first find that Mintmire (and

Logue as to Count Three) was acting as a lawyer and, upon that showing, the

Government was required to prove beyond a reasonable doubt that Mintmire (and

Logue as to Count Three) was not providing *bona fide* legal services:

> The law provides a complete defense commonly referred to as an
> affirmative defense to the offenses charged in Counts 1 and 3 of the
> indictment because one who is performing bona fide legal

[6]Although the Government had also alleged a conspiracy with Mark Mintmire, Donald Mintmire's son, and Charles Adams, as well as "others unknown," the district court ruled that Count Three could only go to the jury on the theory that Logue and Mintmire were in a conspiracy.

representation services does not have an improper purpose. His purpose to zealously represent his client is fully protected by the law. If you find that the defendant provided legal representation services, in connection with the charged conduct in Counts 1 or 3, and the defendant was providing lawful, bona fide legal representation services in connection with or in anticipation of an official proceeding, that is, a grand jury or SEC investigation, then you must find the defendant not guilty. In order to find the defendant guilty, the government must prove all of the elements beyond a reasonable doubt as I originally read to you as to Counts 1 and 3. If you find the defendant provided legal representation services, in connection with the charged conduct in Counts 1 or 3, the government must also prove beyond a reasonable doubt that the defendant was not providing lawful, bona fide legal representation services in connection with or anticipation of an official proceeding.

Keith Logue is named as a coconspirator in Count 3. If you find that Keith Logue provided legal representation services in connection with the charged conduct in Count 3, and Keith Logue was providing lawful, bona fide legal representation services in connection with or in anticipation of an official proceeding, then you must find the defendant not guilty. In order to find the defendant guilty, the government must prove all of the elements beyond a reasonable doubt as I originally read as to Counts 1 and 3. If you find that Keith Logue provided legal representation services, in connection with the charged conduct in Count 3, the government must also prove beyond a reasonable doubt that Keith Logue was not providing lawful, bona fide legal representation services in connection with or in anticipation of an official proceeding.

The jury returned guilty verdicts on both remaining Counts One and Three.

Although Mintmire renewed his motion for judgment of acquittal as to those counts and moved for a new trial, those motions were denied. Mintmire was sentenced to concurrent terms of imprisonment of twenty-one months, two-year

8

terms of supervised release, a fine of $80,000, and the prohibition of "engag[ing] in any business that offers securities, investments, or business opportunities to the public." This appeal followed.[7]

**B.  Evidence Presented by the Government at Trial**

**1.  NASD Applications by Fundae and Clements**

During the trial, a representative of the National Association of Securities Dealers (NASD) testified about the application procedure for companies to "make market," that is, be traded in their particular stock. A company submits an application (Form 211) for review through a NASD broker who collects the relevant information on behalf of the applicant companies and represents that the information contained therein is reliable and accurate.

With respect to applications submitted by small companies, NASD's review focuses on how the company was formed, the identities of the shareholders and officers, and how those shareholders acquired their shares in the company. In order for a free trading market to exist, NASD requires (and the SEC has approved) that a certain number of shareholders must be freely trading shares - the stock must not be controlled by just one or two individuals. Thus, if a number of

___

[7]Although the district court denied Mintmire's motion for bond pending appeal, this court reversed that decision and granted him bond.

individuals are listed as shareholders, but all of their shares are controlled by one person, a full SEC disclosure is required.

On June 23, 1999, NASD received an application from the broker Public Securities on behalf of Fundae indicating that the "[i]ssuer was introduced by Don Mintmire of Mintmire & Associates [("M&A")], councel [sic] & transfer agent to the issuer.  Mr. Mintmire has been known to Public [Securities] for 2–3 years and has been council [sic] to other issues filed by this firm."  Also attached to the application was a list (bearing a facsimile data line from M&A) of twenty-six individual and corporate shareholders in Fundae, including twelve individuals with addresses in Atlanta, Georgia (Mary Catherine McGowan, Jeffrey Merback, Jennifer Froehlich, Brandon Bell, Anne Marie Fourdan, John Marratt, Lisa Reisman, Roxanne Brock, Julie T. Watson, Sammy Peroulas, Kim Davies, and Carmen Ockletree) and fourteen individuals with addresses in Florida (A. Rene Dervaes, Jr., the sole officer and director of Fundae, Angie M., Inc., Angela Bartoletta, Amy Anne Melice, PSJ Holdings, Inc., Marco Beach Gardens, Inc., Paul Safran, Jr., Felice E. Melice, Samuel Melice II, John Stagl, Charles Adams, Adams, Inc., Kerry Mathieu and Devin, Inc.).

NASD identified a number of deficiencies in the application because Fundae had so few shareholders and very little capital, and therefore NASD requested that

Public Securities submit additional information.  Public Securities replied (on

M&A letterhead) with a four-page response signed by Mintmire, stating in part:

> 5.      Please provide the staff with details surrounding the issuers
> Rule 505 and 506 offering.  Your answer should include, but is not
> limited to, who solicited investors, how they were known to the
> solicitor and how many individuals were solicited including those that
> did not purchase.  In addition, please provide the staff with a copy of
> the executed subscription agreements and respective checks.
>
> Answer:   No investors were solicited who did not purchase. The
> investors were known to the Director of the Company [Darvaes] and
> purchased shares through that individual.  Each of the investors is
> considered to be a sophisticated investor, understands corporate books
> and records and had total access to all company records prior to
> investing.  Specifically each investor had the nonfinancial and
> financial data required by Rule 502 of Regulation D and specifically
> Rule 502(b).  Copies of the executed Subscription Agreements are
> attached.  Checks are unavailable. The funds were deposited into an
> independent escrow account prior to transfer to the Company upon
> acceptance of the subscriptions.

In response to question six, that asked for a description of the "relationships or

affiliations" that existed "among and between" the shareholders, Mintmire

explained that Angela Bartoletta was the sole officer and director of Angie M.,

Inc., outlined the familial relationship between Amy Anne, Samuel and Felice

Melice, and otherwise represented: "[w]e confirm that there are no other

relationships among and between the shareholders to the best of our knowledge"

and "[a]ll [relationships] have been disclosed."  Finally, NASD asked  Public

Securities to "[p]lease indicate if any person has dispositive control over any

11

shares of the issuer other than the corresponding shareholder listed on the shareholder list," to which Mintmire's letter declared: "No one has such control." Although the subscription agreements, which were signed although undated, were attached to Public Securities' responses on behalf of on behalf of Fundae, NASD was concerned because the checks ostensibly used to purchase the stock were not attached to the agreements.

After reviewing the responses, NASD notified Public Securities that it had discovered that "several of the shareholders on the shareholder list of the issuer are involved in other companies that involve Donald F. Mintmire and Mar[k] A. Mintmire" and therefore, NASD requested more explanation of the shareholder relationships and "if any of the shareholders on the shareholder list of the issuer are acting as a group." NASD also requested another form of proof that the shareholders had actually paid for the shares because the checks used to purchase the stocks had not been produced. Public Securities responded by attaching a January 1999 bank statement showing a deposit for $20,000 and a total balance for the same amount, along with the following statement drafted by Mintmire:

> We have reviewed the matter at length with our client. Certainly there are other shareholders who have invested in companies in which the two named individuals are also investors and/or principals. There is no relationship between the two individuals and any other investors except that the investors are known to the individuals, are willing to invest in individual companies as the opportunities arise, and most

12

certainly relied to some extent upon the judgement and knowledge of one or both individuals.  However, these investors do not act as a group, are not acting as a group and make an individual judgement on each particular company to which they are introduced.  That is why the shareholder list varies except for some of the shareholders who are interested in investing in all of the companies.

Thereafter, NASD again requested from Public Securities "documentary evidence of receipt of funds from the individual shareholders that have purchased shares in the issuer's offerings, ([*i.e.*] Checks)."  Public Securities responded with copies of $800 and $1600 checks made out to M&A or Mintmire's trust account in December 1998 and one in December 1999.

On October 13, 1999, NASD notified Public Securities that it had approved Fundae to submit a quote on the Over-the-Counter ("OTC") Bulletin Board for common stock, and Fundae was quoted on the OTC stock exchange.  Fundae later merged and changed its name to cMeRun Corporation.

On May 8, 2000, Clements (who had also been referred by Mintmire) submitted an application to NASD.  NASD noted various deficiencies in the application and materials, and Public Securities (through Mintmire) and NASD again requested additional evidence of the independence of the shareholders. Mintmire responded with the following information: (1) names, addresses, and number of shares purchased by the shareholders, some of whom were also Fundae shareholders (Brandon Bell, Kimberly J. Davies, Anne Marie Fourdan, Jeffrey

13

Merback, and Julie Taylor Watson); (2) a chart indicating that 5,000,000 shares had been transferred to Kevin Bell by Xaio-Fei Davis while 500,000 shares had been issued to Stacy Wolfgang who then transferred the shares to twenty-four individuals; and (3) an agreement between Lucid and Citrus indicating that Lucid acquired Citrus' shares and formed Clements with Mintmire as the issuer.

## 2.     The SEC Investigation of cMeRun

In July 2000, the SEC[8] began investigating cMeRun regarding possible false statements that may have led to the resignation of the company's accounting firm. Later in its investigation, the SEC focused on its belief that Fundae was a "blind pool company" that existed solely to acquire other companies.[9]  Specifically, the SEC noticed that cMeRun documents included the names of both Mintmire and his son Mark Mintmire, who resided in Atlanta, Georgia along with a number of twenty-something shareholders who were not sophisticated investors with high incomes.  The SEC issued a number of subpoenas to Mintmire and M&A (requesting all documents relating to Fundae and to both the individual and

_____

[8]An SEC representative testified at trial.  However, because the transcripts were not filed on the district court's docket sheet and the parties did not supply the full record, we do not have the name of the person who was called to testify.

[9]According to the SEC, nominee shareholders in blind pool companies may appear to be shareholders with a financial interest when in fact the shares are controlled by a single individual – a scheme sometimes termed a "box job."  The single shareholder would create a "public float" and single-handedly manipulate the shares in the market.

14

corporate shareholders), Devin, Inc. (a shareholder of Fundae for whom Mintmire was the registered agent), and other listed Fundae shareholders (requesting documents and later, testimony).[10]

Mintmire also testified to the SEC that: (1) Fundae put together the investors; (2) "Rene [Dervaes]" knew some of the shareholders; (3) his son Mark Mintmire had helped solicit some of their mutual friends; (4) he had loaned $20,000 initially to Fundae with the *oral* understanding that it would be repaid; and (5) he recalled speaking to some of the shareholders about the loan agreements. The SEC ultimately chose not to charge criminally Mintmire nor file civil claims against him because it found there was no substantial harm to investors and the SEC resources that would be required to investigate and prosecute were not merited by the enforcement value.

During his testimony before the SEC, Mintmire estimated that he had made approximately $200,000 from the sale of Fundae shares and that his son Mark Mintmire had made around $50,000. Evidence was also introduced at trial that in 2000, Mintmire purchased 35,000 shares of Clements at three cents per share and traded 20,000 shares over the next four days at prices ranging from $5.38 to $6.13

_____

[10]The Government claimed at trial that subpoenaed documents from Clements, Tech-Creations, and Lucid were not produced.

per share, and in 2000 and 2001, Mintmire transacted over $500,000 in shares of Clements.

### 3. Testimony from Shareholders in Fundae and Clements

Several individuals listed as shareholders on both the Fundae and Clements NASD applications testified at trial.

### a. Atlanta, Georgia Shareholders

Several shareholders who had either worked with Mark Mintmire at a restaurant in Atlanta, Georgia, or had been his customers at the restaurant, testified regarding their "purchase" of shares in the companies. First, Jeffery Merback testified that he, Mark Mintmire, and Kevin Bell were servers at a restaurant in Atlanta, Georgia in 1991, one year before Merback became the owner and operator of another Atlanta restaurant where Mark Mintmire had also worked. At that time, Mark Mintmire, who stated that he was working for his father, had offered Merback and his employees an opportunity to earn $100 in exchange for signing "some legal-looking papers," and Merback agreed. After Merback took the papers to have them stamped "Medallion Guaranteed" by the bank, he and the others wrote Mark Mintmire a check for $800 and Mintmire gave them $900 in exchange. At trial, Merback identified a number of documents with his signature on them, including a Share Purchase Agreement and a Stock Power with a Medallion

16

guarantee, although he did not recall seeing any stock certificates attached to those documents when Mark Mintmire gave him the paperwork to endorse, nor did he recognize stock certificates that bore his name for over 300,000 shares in iJoin Systems, Inc., Lucid, Clements and Tech-Creations. Merback identified the checks he gave to Mark Mintmire, all made out to M&A, but noted that his address had been removed from at least one. Merback was shown his signature on a document entitled "Unanimous Consent of Board of Directors and Shareholders," which also contained the names of customers of his restaurant, but he denied knowing anything about the Fundae merger. Merback recognized his handwriting on a subscription data sheet for Gillette Industries Group, Inc. but did not recognize the writing on a Tech-Creations, Inc. subscription data sheet that contained his personal information. Merback testified that he was never told anything about Lucid or Clements, and his total involvement consisted of receiving $900 and writing checks for $800 when Mark Mintmire had asked him to help form a shell company.

In September 2002, Merback received an SEC subpoena regarding the cMeRun investigation that requested documents related to Fundae, Mark Mintmire, Donald Mintmire and some of the other purported shareholders. Mark Mintmire urged Merback to call Donald Mintmire's personal assistant in Florida to obtain

17

the documents, which he did.  Merback forwarded those documents to the SEC and testified before the grand jury in Florida that no one had told him that he owned any stock or that the money he was paid for writing the checks was a "loan."  He also testified that he had never met or spoken to Donald Mintmire.

Kevin Bell confirmed that he had worked at the Atlanta restaurant with Mark Mintmire and Merback.  Bell testified that: (1) Mark Mintmire gave Bell and others documents to sign in exchange for money; (2) Mark Mintmire gave Bell and others cash to deposit, of which they were permitted to retain $100, in exchange for writing checks; (3) he thought this would be beneficial because he wanted to start a business; (4) he did not recall hearing about Lucid at that time, and had never seen any of the filings until they were later shown to him by government officials; (5) he never recalled becoming a principal of Lucid nor acquiring five million shares of its stock; and (6) he did not recognize the name of the person to whom he supposedly transferred the five million shares or the "Chinese" guy (Xaio-Fei Davis) who supposedly transferred them to him.  At trial, Bell reiterated that he had never agreed to become a director or officer of Clements, and that, in exchange for drinking money, he signed documents that Mark Mintmire brought to him while he was drinking in a bar.  Bell denied knowing about any of the stock investments and exclaimed that much of the notes in Mintmire's handwriting on a

18

Government exhibit that referred to Bell were "Greek" to him, including the following notations: (1) Bell had borrowed money from a "Freda" as part of the transactions; (2) $800 and "DFM;" (3) references to "It's Electric" and a merger involving "Salerno;" and (4) Bell had cancelled his five million shares along with 480,000 other shares. Bell declared that he barely even knew or had spoken to Mintmire at the time of the described events.

Matthew Hann, who had also worked under Mark Mintmire at the Atlanta restaurant, testified at trial that he was asked by Mintmire to "get some papers stamped at the bank" and to write a $800 check to Mintmire in exchange for $900. Hann did as Mintmire requested, and he also witnessed a number of employees and regular customers filling out paperwork at the restaurant, including Marco Gollarza, Mike Bunn, Jeff Merback, Kevin Bell, Brandon Bell, and Chris Jackson. Hann further testified that: (1) he did not consider himself a sophisticated investor; (2) he did not believe that any of the pages were stock certificates, but acknowledged that they could have been stock powers since he did not review the documents and nothing was explained to him; (3) he did not have any conversations with Mark Mintmire about investing; (4) he did not believe that the money which had been given to him in exchange for the $800 check (the $900) was a "loan;" (5) he did not believe that he was retaining any interest in any stock;

19

(6) Mark Mintmire told him that these actions were legal, and they would not result in any tax consequences for him; and (7) Mark Mintmire also explained to him that the purpose of the paperwork was to set up a shell company which would later be sold off and at that point, Hann would "completely be off everything." Mark Mintmire told Hann that he was working for his father's firm, although Hann had never met nor seen Donald Mintmire.

Mary Catherine McGowan, a college professor living in Florida who had formerly lived in Atlanta, testified that she had been introduced to Mark Mintmire by her boyfriend. On approximately twenty-one occasions for five separate companies, McGowan received paperwork from Mark Mintmire, went to the bank for a Medallion seal, and returned the paperwork to Mark Mintmire.

Other shareholders who were workers or customers at the restaurant - including restaurant employee Marco Gollarza, customer Kimberly Dennis a.k.a. Kimberly Davies, customer Brandon Bell,[11] customer Julie Taylor Watson,[12] and

---

[11]Brandon Bell testified that he was asked by Mark Mintmire to write "Lisa Reisman, subscription, Fundae," in the "for" section of one check and that Mark Mintmire had told him that he had spoken to Lisa and she had approved. He believed that Mark Mintmire filled out the forms and he signed them and recalled signing some of the documents when they were blank. He noticed at trial that it appeared that whiteout had been used on one of the documents that now said "Lucid Concepts, Inc." across the top; he could see "Fundae Corporation" when it was held up to the light.

[12]Watson also recognized that one of the documents she had signed had been altered with whiteout. After receiving a subpoena for documents and her testimony from the SEC, Watson contacted and received documents from Mintmire and retained an attorney who was recommended to her by another lawyer who attended her church. Because Mintmire had agreed

Allison Salerno who knew Mark Mintmire through her husband[13] - also testified regarding similar experiences with Mark Mintmire.

### b.      Florida Shareholders

Kerry Mathieu, who was listed on the NASD application for Fundae as a shareholder residing in Florida, testified at trial that Charles Adams was her supervisor at an auto dealership where she worked.  Adams approached Mathieu and another employee Angela Bartoletta to inquire as to whether they wanted to have their own companies and save on taxes.  Adams told Mathieu that he was working through Mintmire and his law firm and that her participation would not cost her anything.  Mathieu testified that: (1) she believed that the name of the company set up for Bartoletta was Angie M., Inc.; (2) the name of her company was Devin, Inc.; (3) she did not believe she had invested in Fundae; (4) she went to the bank on several occasions to acquire a "green bank seal;" (5) although a $1,600 check she had written bounced twice, the money to cover the check was eventually wired by Mintmire to her account; (6) she called M&A to obtain a number she needed for tax purposes but did not speak directly with anyone there about the incorporation itself; and (7) Adams told her that she needed to be the one to write

---

to pay for her lawyer if she retained one, Watson sent the bill for the legal services to Mintmire and believed that the last time she spoke to him was to verify that the bill had been paid.

[13]At trial, Salerno testified about documents that appeared to have been signed by her, but were in her husband's handwriting.

the checks for stock investments in order to keep the corporation running but that he would give her the money to cover the checks. Mathieu also was shown a number of checks she had written at Adams' request - including two checks made out to "Willow Services, Inc.," the company associated with the offices Mintmire used while in Chicago – and she testified that Adams told her the paperwork that she completed was related to her corporation and that he would forward it to M&A.

Adams contacted Mathieu after she had received a subpoena from the SEC and told her to let him take care of it. Mathieu declined Adams' offer, but called M&A at his advice to obtain copies of the documents she had signed. Mathieu asked Mintmire to give her the documents relating to Devin, Inc., and Mintmire told her that he also had received a subpoena. When Mintmire started asking her questions about the subpoena, Mathieu lied and told him that she was represented by counsel and that her attorney would "contact him for further information."[14] Although Mintmire told Mathieu that he would send her the documents before the subpoena deadline, he did not do so. She was shown a number of documents at trial but did not recognize the names of the corporate entities (with the exception of Tech-Creations, Inc.) and denied having executed various cashier's checks.

---

[14]Mathieu testified that Mintmire was "overly nice" which made her uncomfortable.

22

Adams testified at trial that: (1) at the time he approached Mathieu and Bartoletta, he had known Mintmire for about "five to ten years;" (2) M&A generated the forms that he asked Mathieu and Bartoletta to sign; (3) Mintmire was the registered agent of the companies; (4) Mathieu and Bartoletta agreed to "hold stock;" (5) he did not recall the names of the companies but remembered that Mathieu and Bartoletta went to the bank around fifteen times to obtain Medallion guarantees on the documents; (6) he did not remember who was listed as the payee on the checks; and (7) he was associated with Adams, Inc., which was listed on the NASD Fundae application list as a shareholder along with Adams himself. Adams also admitted that he provided the paperwork to Stacy Wolfgang, to whom 500,000 shares were transferred and then transferred again to twenty-four individuals.

### 4. Keith Logue's Involvement with the Shareholders

Keith Logue, an attorney in Atlanta and a previous law partner of Mintmire's whom Mintmire had known for fifteen years, testified at trial regarding his involvement with two of the listed shareholders. Logue was given immunity by the Government, although he denied that he had done anything wrong or that Mintmire had improperly influenced him.

### a. Mary Catherine McGowan

Logue's first involvement was with Mary Catherine McGowan after she received a subpoena to testify before the SEC. According to McGowan, at Mark Mintmire's request, she contacted Mintmire who directed her to Logue. Logue confirmed that he was contacted by Mintmire about representing McGowan regarding her testimony before the SEC in Atlanta (as Mintmire had done in the past when he referred clients to Logue) and that Mintmire informed Logue he would pay for the representation. Mintmire explained to Logue that McGowan was one of many shareholders in a company who had executed some documents. Thereafter McGowan met with Logue in Atlanta and, with Logue representing her, later gave a sworn statement to the SEC.

Prior to her testimony, McGowan had also received a document subpoena from the SEC and had produced in response a few cancelled checks, a scanned version of one of the signature guarantees for Fundae, and other documents that she obtained from "the Mintmires." When a question arose during the course of her deposition regarding whether the subpoena to her included documents dealing with companies other than Fundae, Logue and the SEC counsel agreed to address the issue later. Sometime after the deposition, McGowan found backdated cancelled checks involving at least one other company besides Fundae, and

24

according to McGowan, when she asked Logue about producing them to the SEC, he told her not to produce them and that he would contact the SEC on her behalf. McGowan testified that she believed that Logue actually spoke to SEC counsel and informed them that if the SEC wanted the additional documents they would have to issue another subpoena. McGowan also testified that she was pleased with Logue's representation of her and his advice that they should not produce any documents not demanded by the subpoena, and that Logue told her to tell the truth.

Logue recalled that he met with McGowan and advised her that it was in her best interest to testify, to tell the truth, and to produce whatever documents she had in her possession. Logue testified that he believed the SEC investigation involved only Fundae, but he admitted that he was unsure of whether McGowan was a target of the SEC investigation. Logue further testified that he believed that the subpoena to McGowan, which listed a number of companies, sought only documents related to Fundae and not to other companies. Logue recalled speaking to McGowan about the documents a number of times following the deposition and being told by McGowan that she could not find any additional documents. Logue did not recall calling SEC counsel, but indicated that he must have done so because he remembered telling SEC counsel that he would follow up and he was "pretty good about returning phone calls." Counsel for the SEC testified that he did not have

25

any conversations with Logue after McGowan's testimony, even though he had left a series of messages about obtaining those documents. The SEC did not issue an additional subpoena for the documents.

Although McGowan testified that Logue had never discussed his fee arrangement with her, McGowan was presented at trial with an invoice for Logue's services, addressed to her, for $3,497.50 and a check payable to Logue and signed by Mintmire for the invoice amount. The check was drawn on the company account for ImagineNet Corp., a name McGowan claimed did not recognize until she was shown a $200 check from her personal bank account made out to ImagineNet Corp. Logue acknowledged that he had never submitted his bill for legal services to McGowan but, instead, had sent the bill to Mintmire because he (Mintmire) had indicated he would pay it.

Logue also admitted that he had tried to contact additional shareholders, but he denied that those contacts were an attempt to represent them and instead were his efforts to gain insight into the investigation.

### b. Kevin Bell

In August 2003, when the Government was conducting a grand jury investigation concerning the sale of stock in Clements, Logue received another request from Mintmire about representing Kevin Bell, who was listed as a Lucid

26

shareholder and who had received a subpoena via Mintmire's office to testify before a federal grand jury in Florida. Mintmire sent to the subpoena to Bell with a note stating: "[w]e accepted this on your behalf . . . . If this is unacceptable you should talk to your lawyer about it. Pursuant to your instructions we are forwarding a copy to your attorney, Keith Logue, at fax number . . . [y]ou advised his phone number was . . . . " Bell testified that when he received the subpoena and note from Mintmire, he had no idea who Logue was and that it was Mintmire who put him in touch with Logue after he received the subpoena.

At trial, Logue declined to interpret the note from Mintmire regarding Bell's representation, but he acknowledged receipt of a number of corporate documents and a page of photocopied handwritten notes - which the parties stipulated were in Mintmire's handwriting - outlining Kevin Bell's ostensible participation in Fundae. The documents sent to Logue had the facsimile stamp of Willow Services, the office utilized by Mintmire while he was in Chicago. Logue's own handwritten notes were also introduced into evidence, but he testified that he did not know if the notation indicating "totally relied on Don" came from Mintmire.

Logue testified that he did his own due diligence on the case, interviewing Bell, retrieving files off EDGAR, reviewing information with Bell, and calling to reschedule Bell's grand jury appearance. Bell told Logue that he did not know

27

anything about Lucid. Logue did not accompany Bell to his grand jury appearance in Florida, and the bill for his services to Bell was submitted to and paid by Mintmire. Although Logue was shown a Government exhibit with a notation in his handwriting stating "couldn't get list from Jeff," he testified that he could not recall such a list nor did he recall speaking to either Jeff Merback or Kevin Bell about a list of potential witnesses.

According to Bell, he met with Logue at a coffee shop in Atlanta where Logue pulled out a yellow pad with a "time line" on it and explained the organization of Lucid (the company of which Bell had been listed as "president"). After Logue told Bell he respected and "owed" Mintmire, Bell became skeptical of Logue's allegiance and declined to have Logue accompany him to Florida for the grand jury appearance. Bell later learned that Logue had rescheduled Bell's grand jury appearance for a later date without Bell's consent. On the rescheduled date, Bell traveled to Florida and testified before the grand jury.

### 5. The Recorded Conversations Between Kevin Bell and Mintmire

Following his testimony before the grand jury, Bell contacted Mintmire and permitted the Government to record his conversations. Conversations were recorded on three different days in September 2003. On September 11, 2003 after Bell's grand jury appearance, Mintmire and Bell discussed the following:

28

KB: OK. And then the, what about the $4000 thing that, that uh . . .

DM: Did they ask you about that?

KB: Well, I, I seen what Keith Logue pulled up and they had the same thing that he pull, pulled up. And um, you know, and I got a Treasury guy right there with 1099's you know.

DM: Well what did I tell you about that?

KB: You told me it was for fees.

DM: Yeah.

KB: You know, uh . . .

DM: Yeah.

KB: But you know, they, they're still telling me that I'm supposed to, that I'm liable for it and I don't know if it's a smokescreen or they're trying to scare me but.

DM: That you're liable for what?

KB: The tax on that money.

DM: Well, if you are, I'll give you the money.

KB: OK.

DM: Don't worry about it. If you, and if you've had some expenses out of this thing, I'll hand-, I'll take care of 'em, you just let me know what it is.

KB: OK.

DM: And it's not to buy your testimony.

KB: I understand.

DM: It's just to cover your expenses.

Bell and Mintmire then discussed Mintmire's son, Mark Mintmire, with Bell explaining that Jeff Merback had talked about Mark:

DM: How much did you get Mark involved, I mean . . .

KB: Um.

DM: How, how did that come up and what did you say so along [sic]?

KB: Well Jeff, Jeff told, told the story first. So Mark would be involved heavily by the time Jeff's story was done.

DM: Why does he have to be such a bastard?

Mintmire then instructed Bell as to what the other shareholders should say when

questioned:

> KB: But um, what do I tell like my friends when they um, when they contact them or try to subpoena them or something about this?
> DM: Um, that they subscribed and uh, they just don't remember what happened, after that.  See there, there's some stock was set aside for all     of them.
> KB: Uh huh.
> DM: In the deal, and uh, and that's the way it was.
> KB: Set, it was set aside?
> DM: Yeah, they, for them they could, they'd have later on.
> KB: Uh huh.
> DM: But it's not worth anything now.
> ***
> DM: Well you need to explain to them that, listen, if they tell these guys what they want to know . . .
> KB: Uh huh.
> DM: . . . they're not going to do anything to them.
> KB: OK.
> DM: Uh, if they tell them that they subscribed and you know, of course, I'd like for them to leave Mark out of it to the extent that they can. If they, they can say that I did it. . . . .

During the next conversation, on September 17, 2003, Mintmire discussed

his son Mark Mintmire in the context of his participation:

> KB: My friends um, you know, but I yeah, I believe I, got everybody that they understand that Mark, you know, I have to remind 'em about his character, you know.
> DM: Yeah.
> KB: The type of person he is.
> DM: Yeah, yeah, right.
> KB: (UI)
> DM: And um, Mark was doing it for me.
> KB: Right.

DM: You know, and I think that's the way that it needs to stay.

KB: Well, that, that's exactly how I, I said it.

DM: And he brought the papers around and explained it and uh, and then sent them down to me.

Later, during their conversation on September 23, 2003 Mintmire again discussed

Mark with Bell:

KB: I don't feel I'm, I'm protected at all.

DM: Well . . .

KB: And I'm not getting any answers, I mean, that document, where, I didn't sign anything in '99, and there's a bio on me, and it's saying that I did not file for any bankruptcies.

DM: Yeah.

KB: I would never [put] that down on a federal document.[15]

DM: Yeah, yeah.

KB: So how did that happen?

DM: Well, on all of those documents, I got back signed through Mark. Uh, Kevin, uh, and you'll, and you can talk with Mark about it. Maybe you and Mark should talk. Um, it might be healthy for you, maybe you even need to see Mark or something, but uh, that's up to you. Um, but just, you know, think your way through these things, OK? Nobody's, they're not after you. Did they say they were after you?

KB: No, but your name's not . . .

DM: They just want to use you to get to Mark and me.

During their last recorded conversation, Mintmire and Bell discussed Bell's

cooperation and participation in the investigation:

KB: . . . so I went over to talk to Jeff, um, still trying to get the list and I also told Jeff that um, Keith Logue would uh, you know, you know, help ease some of his you know, anxieties about everything.

---

[15]Bell was speaking about the fact that the securities documents inaccurately reflected that he had not been involved in a bankruptcy when in fact he had.

DM: Uh huh.

KB: If he needed to speak to him.

DM: Yeah.

KB: Um, you know, I told him that I spoke with him and he made me feel better about it and you know, (UI) and I'm gonna tell my friends and I said if you need to speak to somebody about it, I'm sure they could speak to Keith and he would get them pretty straight. So guess what Jeff does? He goes straight over to the uh, uh, US Attorney, the assistant, uh, district attorney, he doesn't say a word, he just goes right over there, just starts talking to him and then the uh, attorney calls me over and he asks, he asks me, I told him that Keith Logue didn't represent me, and he doesn't.

DM: Uh huh, right

KB: And he calls me over and says I thought Keith Logue didn't represent you. You told the Grand Jury that he didn't repre-, represent you. So why you trying to get him involved, you know, and he's like pissed off at me. Um . . .

DM: You know, that, that's just an example Kevin of why you need somebody to run interference for you, see?

KB: Uh huh.

DM: And that way you don't have to take all that stuff personally.

KB: Right, right. I mean, but I, did I, I didn't know they would be up there yesterday.

DM: No, I know and you didn't do anything wrong. So don't worry about it. All they're doing is, just, you know [expletive] on you.

KB: Yeah, well . . .

DM: So who, who all have they spoken to, do you know?

KB: I, I don't know who they've spoken to because evidently, Jeff told them, um, that I was trying to get the list, um, and trying to get Keith involved and then he started, he started treating me as if I was . . . .

DM: An enemy.

KB: Exactly.

DM: Yeah.

At the suggestion of the Government, Bell told Mintmire that he was

attempting to seek legal representation:

KB: Um, and he [the fictitious attorney] went over, he had copies of some SEC filings as a matter of fact, I have one of them here, for um, Lucid Concepts.

DM: Yeah, right.

KB: So he started asking me questions, like how did I purchase the shares and inside this uh, filing it says that I was the person who made all the decisions, it said I had a, a expense report in it. Um, he asked me if all this is true, and I said I, I don't know anything about any of that and doing anything, he said did you sign it?

DM: You know, you know Kevin, you're talking to too many people and they're gonna set you up for something if you're not careful.

## C.    Evidence Presented by Mintmire at Trial

Mintmire presented two witnesses in his case-in-chief at trial. The principal witness for Mintmire was a Miami attorney, Robert Josefsberg, who was allowed to testify as an expert witness on "legal ethics and attorneys' duties in grand jury and regulatory investigations." Josefsberg attempted to bolster Mintmire's affirmative defense under § 1515(c), which provides an exemption from obstruction for those providing *bona fide* legal services, and he testified that Mintmire represented virtually everyone including every shareholder who received a subpoena. Josefsberg also repeatedly stated that Mintmire was not guilty of obstruction. Specifically, Josefsberg testified that: (1) Mintmire was providing legal services when he recommended (in response to the Government's subpoena) that Logue represent Kevin Bell in the grand jury investigation; (2) counsel for one party may provide information and theories on how to deal with the facts to

counsel for a witness; (3) Mintmire acted properly when he advised Bell that witnesses have a right not to speak voluntarily with investigators, when he counseled Bell to advise others to state that they did not remember where the record establishes that they did not remember, and when he monitored the grand jury investigation by, among other things, debriefing Bell and attempting to obtain a list of potential witnesses; (4) Mintmire was providing *bona fide* legal services in connection with the grand jury investigation and the SEC proceeding and acted properly when he fulfilled his "moral duty" to minimize his son's involvement in the case; and (5) Logue's interpretation of the SEC subpoena served on McGowan was appropriate and the SEC should have moved to compel production or issued a new subpoena if it disagreed with that interpretation.

## II. DISCUSSION

On appeal, Mintmire claims insufficient evidence supports the jury's guilty verdict as to both counts. He also claims that the trial court erred by not acquitting him based upon the safe harbor provision of 18 U.S.C. § 1515(c) and by improperly shifting the burden of proof under § 1515(c) to him by instructing the jury to decide if Mintmire (as related to Count One) and Keith Logue (the alleged unindicted co-conspirator of Count Three) were "acting as lawyers" when they committed the acts in question. Finally, Mintmire argues that the trial was tainted

34

by the Government's joinder of Counts Two and Three, which charged obstruction of and conspiring to obstruct the SEC investigation into cMeRun, with Count One, which related to obstruction of a different grand jury investigation, such that the presentation of evidence as to both instances created prejudicial spillover and was confusing and corrupting of a fair trial. Mintmire claims this was compounded by the acquittal as to Count Two, which the district court dismissed on Mintmire's motion at the close of evidence having found that the alleged acts pre-dated the effective date of 18 U.S.C. § 1512(c)(2).

### A.  Sufficiency of the Evidence.

Mintmire's challenge to the sufficiency of the evidence to support his convictions on Counts One and Three involves questions of law which we review *de novo*. *United States v. Dodds*, 347 F.3d 893, 900 (11th Cir. 2003). A factual finding will be sufficient to sustain a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "[A]ll reasonable inferences must be drawn in favor of supporting the jury's verdict." *United States v. Sawyer*, 799 F.2d 1494, 1501 (11th Cir. 1986) (per curiam) (citing *Glasser v. United States,* 315 U.S. 60, 80 (1942)).

35

Viewing the evidence in the light most favorable to the Government and, as we must, drawing all reasonable inferences and credibility assessments in the Government's favor, *United States v. Harris*, 20 F.3d 445, 452 (11th Cir. 1994), we find that there was more than sufficient evidence to sustain Mintmire's convictions under Counts One and Three. First, as to Count One, the trial court properly instructed the jury that the Government was required to prove the following: (1) there was an official proceeding taking place, in this case, a grand jury investigation; (2) Mintmire "engaged in conduct which constituted a substantial step toward the commission of the crime of obstruction of an official proceeding;" (3) Mintmire acted "'corruptly,'" *i.e.*, "with an improper purpose and to engage in conduct knowingly and dishonestly with the specific intent to subvert, impede or obstruct" the grand jury investigation; and (4) "[t]he natural and probable effect of [Mintmire's] conduct would be the interference with the due administration of justice."[16] *See, e.g., United States v. Thomas*, 916 F.2d 647, 651 (11th Cir. 1999) (discussing analogous elements of 18 U.S.C. § 1503).

In this case, we have no hesitation in concluding that the jury was presented with ample evidence from which it could find that Mintmire violated § 1512(c)(2) by attempting to obstruct a grand jury investigation. As to the first element, there

---

[16]Neither Mintmire nor the Government has raised an issue about the court's instructions regarding the elements of § 1512(c)(2).

is no dispute that an "official proceeding" as defined by the statute was indeed underway. As to the second and third elements, substantial evidence was presented from which a jury could infer that Mintmire "engaged in conduct which constituted a substantial step toward the commission of the crime of obstruction of an official proceeding" and that Mintmire acted "corruptly." The evidence before the jury suggested that from the moment Kevin Bell was subpoenaed, Mintmire controlled his participation in the grand jury proceedings. As part of Mintmire's initial contact with Bell regarding his grand jury subpoena, Mintmire created documentation that made it appear that Bell had given Mintmire the name and number of attorney Logue. In reality, however, Bell testified that Mintmire told him that he had received a grand jury subpoena directed to Bell and that he would have someone (Logue) explain it to him. Bell's version of the events was consistent with uncontroverted evidence that (1) Mintmire had referred matters to Logue in the past, including the matter involving McGowan who was subpoenaed in the SEC investigation, and (2) Mintmire and Logue had known each other for over fifteen years.

Evidence was also presented at trial that Mintmire attempted to orchestrate Bell's testimony to the grand jury. Mintmire sent notes to Logue so that he could "coach" Bell according to Mintmire's version of events, but Bell made clear that he

was unaware of the following events: (1) at one point he had owned five million shares of Clements stock; (2) millions of "Bell's" shares had been "cancelled;" and (3) he was an officer and director of Clements.[17] Bell also knew nothing about an agreement between Lucid Concepts, Inc. and Clements Citrus Sales of Florida, whereby the latter's shares were acquired by Lucid - an agreement ostensibly signed by Bell with Mintmire acting as the issuer. Moreover, the jury had evidence before it that, in stark contrast to Mintmire's attempts through Logue to coach Bell, Mintmire represented to NASD (during its inquiry concerning the Clements application) that: (1) five million shares had been transferred to Kevin Bell by a person named Xaio-Fei Davis; and (2) Bell was an officer and director of Lucid (f/k/a Clements). Kevin Bell testified at trial that he did not recognize the name of the "Chinese" guy. The jury also was presented with Mintmire's sworn deposition before the SEC, which contained numerous misrepresentations that were disputed by witnesses at trial, including that monies given to the nominee shareholders were "loans" and that the shareholders were aware of that fact. This evidence gives context to Mintmire's recorded conversations with Bell: for example, when

_____

[17]The jury also had evidence before it that many Clements shareholders had been listed as shareholders for Fundae Corporation including B. Bell, Davies, Anne Marie Fourdan, Merback, and Watson.

Mintmire "reminds" Bell that the money was for "fees" Mintmire asks him, "[W]hat did I tell you about that?"

Additionally, despite the testimony advanced by Mintmire's legal expert, Josefsberg, that a father has a right, even a moral obligation, to shield his son, the jury could infer that Mintmire had ignobly embroiled his son in his misconduct. It is impossible to justify Mintmire's suggestion to Bell - and through Bell to other potential witnesses - that they keep Mintmire's son "out of it to the extent that they can." Mintmire knew that his son had recruited a number of unsophisticated "investors" to serve as nominee shareholders, paying them to sign documents and to have those documents verified by various bank officials.

Mintmire also suggested that Bell tell the other shareholders that it was acceptable for them to testify that all they could remember was that they signed documents. While before the SEC, Mintmire had described some of these nominee shareholders to be individuals who were not operating as a group and who exercised independent judgment. To the contrary, there was more than sufficient evidence to refute Mintmire's representation and to show that Mintmire controlled their shares. By attempting to persuade Bell to tell the shareholders that they merely had signed documents, and had relied on him in doing so, Mintmire was

39

attempting to conceal the truth from the grand jury, *i.e.*, his son was heavily involved in the illicit conduct.

The above ample evidence and other evidence presented at trial allowed the jury to conclude that Mintmire was committing substantial steps toward the crime of obstruction, acting corruptly, and that the probable result of his actions would be withholding information from, or putting misinformation before, the grand jury. Accordingly, the jury's verdict as to Count One that Mintmire interfered with the due administration of justice is amply supported by the record.

This same reasoning applies to Mintmire's argument regarding Count Three's charge of conspiracy to obstruct the SEC proceeding with Logue.[18] With respect to that count, the court instructed the jury that the Government had to prove: (1) Mintmire and Logue came to a mutual understanding to try to accomplish an unlawful plan, in this case, to corruptly obstruct, influence and impede or endeavor to obstruct, the SEC proceeding; (2) that Mintmire, knowing the unlawful purpose of the plan, willfully joined in it; (3) that Mintmire or Logue knowingly committed at least one overt act; and (4) that the overt act was committed at or about the time alleged in the indictment in an effort to conceal the

_____

[18]As noted earlier, after the close of all the evidence, the district court ruled that the jury would only be permitted to decide if Mintmire conspired with Logue and no one else.

fact that the shareholders in Fundae were just nominees and that Mintmire was in actual control of their shares.

The jury was presented with evidence that even prior to the formation of the conspiracy, Mintmire made various misrepresentations to NASD in response to their inquires regarding Fundae, including falsely stating that the investors were: (1) known to the director of the company; (2) sophisticated;[19] and (3) had "total access to all company records prior to investing." Later, after NASD discovered that some of the shareholders for Fundae also appeared as shareholders "with other companies that involve Donald F. Mintmire and Mar[k] Mintmire," and NASD inquired if those shareholders were operating as a group, Mintmire represented that "these investors do not act as a group, are not acting as a group and make an individual judgement on each particular company to which they are introduced." Mintmire had also represented that no one but the shareholders on the list had dispositive control of the company. These representations, of course, were contrary to the overwhelming evidence that the shareholders were nominees whose acquisition and management of stock was totally controlled by Mintmire.

---

[19]Portions of Mintmire's cross-examination of some of the shareholders centered on their education and their purported investment sophistication. In his closing, Mintmire made a paltry attempt to convince the jury that Bell and others were not duped by him.

Moreover, despite his critical role in recruiting and organizing the shareholders, Mark Mintmire was not mentioned at all in the NASD responses provided by Mintmire. In response to a NASD inquiry requesting that Mintmire "describe all relationships or affiliations existing among and between the shareholders," Mintmire only discussed the relationships between the Florida shareholders, and did not mention either the Atlanta shareholders, or that his son, Mark Mintmire, recruited all those shareholders.

Against the backdrop of those misrepresentations, the jury learned that Mary Catherine McGowan received a subpoena to testify before the SEC, and that Mintmire retained attorney Logue to represent her in those proceedings and paid for her legal bill. When McGowan appeared before the SEC in order to give her sworn statement with Logue as her counsel, Logue objected (allegedly pursuant to his interpretation of the subpoena) to McGowan producing documents relating to any entities other than Fundae despite the subpoena's inclusion of other listed companies. Although Logue remembered that McGowan contacted him after the deposition and told him that she could not find additional documents, McGowan testified to the direct opposite; that is, that she had called Logue and told him that she had found additional documents. Likewise, Logue testified that as he was "pretty good" about returning phone calls, he was certain he had called SEC

42

counsel and informed him that McGowan could not find any additional documents. Again, this testimony was diametrically opposed to that of SEC counsel, who testified that he left Logue multiple messages and that Logue never returned his calls.

Contrary to Mintmire's argument, the discrepancies between Logue's testimony and the testimony of McGowan and SEC counsel did not merely concern whether Logue gave good advice, or whether the SEC was sufficiently aggressive. Rather, the credibility showdown[20] related also to whether Logue deliberately tried to hide information from the SEC. Specifically, because of the interrelation among the shareholders and his previous misrepresentations, Mintmire had reason to fear the investigation would uncover facts showing that the nominee shareholders had been duped into unwittingly participating in multiple corporations whose stock he controlled.

Mintmire also makes much of the fact that he, and sometimes Logue, told some of the shareholders to "tell the truth." But the "truth" was necessarily limited to the information supplied by Mintmire and his son (and later Logue) to the

---

[20]At trial, Mintmire's legal expert acknowledged the discrepancy in the testimony, and while his opinion was that Logue had done nothing wrong, he admitted that the jury would decide whom to believe. The jury thus properly weighed Logue's testimony against the testimony of McGowan and SEC counsel, and its verdict indicates it found the latter witnesses credible.

nominee shareholders during the course of the scheme.  That was very little.  Of course, we must resolve all reasonable inferences, and the jury's credibility choices in favor of the jury's verdict.  *United States v. Gupta*, 463 F.3d 1182, 1193–94 (11th Cir. 2006).  This is not a close call.  The evidence was ample and easily sufficient to support Mintmire's conviction on Counts One and Three.

### B.  Jury Instructions.

We review the legal correctness of a jury instruction *de novo* but defer to the district court on questions of phrasing absent an abuse of discretion.  *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000) (citations omitted).  District courts have broad discretion in formulating jury instructions, so long as the charge as a whole accurately reflects the law and the facts.  *Id.*  We will not reverse a conviction on the basis of a jury charge unless "the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process."  *Id.* (quotation marks and citation omitted).

Mintmire argues that because Counts One and Three both involved attorney conduct, he was entitled to the benefit of the safe harbor provision of 18 U.S.C. § 1515(c) ("This chapter does not prohibit or punish the providing of lawful, *bona fide*, legal representation services in connection with or anticipation of an official proceeding.").  Mintmire argued he was acting as an attorney in his

44

communications with Kevin Bell (Count One) and Keith Logue (Count Three). He

also asserts that the trial court's instruction about the statutory safe harbor was in

error for two reasons: (1) improperly asked the jury to decide if he and Logue were

acting as lawyers and therefore treated Section 1515(c) as an affirmative defense

(as opposed to an element) of Counts One and Three; and (2) failed to set forth the

standard by which to judge the affirmative defense, and improperly shifted the

burden of proof to Mintmire. We disagree.

We find our precedent establishes that Section 1515(c) is an affirmative

defense, not an element of the crimes of which Mintmire was convicted. *See*

*United States v. Kloess*, 251 F.3d 941, 947–49 (11th Cir. 2001). With respect to

the availability of Section 1515(c) as a defense, the district court instructed the jury

as follows:

> The law provides a complete defense commonly referred to as an
> affirmative defense to the offenses charged in Counts 1 and 3 of the
> indictment because one who is performing bona fide legal
> representation services does not have an improper purpose. His
> purpose to zealously represent his client is fully protected by the law.
> If you find that the defendant provided legal representation services,
> in connection with the charged conduct in Counts 1 or 3, and the
> defendant was providing lawful, bona fide legal representation
> services in connection with or in anticipation of an official
> proceeding, that is, a grand jury or SEC investigation, then you must
> find the defendant not guilty. In order to find the defendant guilty, the
> government must prove all of the elements beyond a reasonable doubt
> as I originally read to you as to Counts 1 and 3.

45

If you find the defendant provided legal representation services, in connection with the charged conduct in Counts 1 or 3, the government must also prove beyond a reasonable doubt that the defendant was not providing lawful, bona fide legal representation services in connection with or anticipation of an official proceeding.

Keith Logue is named as a coconspirator in Count 3. If you find that Keith Logue provided legal representation services in connection with the charged conduct in Count 3, and Keith Logue was providing lawful, bona fide legal representation services in connection with or in anticipation of an official proceeding, then you must find the defendant not guilty. In order to find the defendant guilty, the government must prove all of the elements beyond a reasonable doubt as I originally read as to Counts 1 and 3. If you find that Keith Logue provided legal representation services, in connection with the charged conduct in Count 3, the government must also prove beyond a reasonable doubt that Keith Logue was not providing lawful, bona fide legal representation services in connection with or in anticipation of an official proceeding.

A review of the district court's jury instructions made clear that the Government was required to prove each element of Counts One and Three beyond a reasonable doubt before the jury could convict Mintmire. Thus, the jury was instructed to consider whether or not the Government had disproved this affirmative defense beyond a reasonable doubt. Because the jury was ultimately given the proper standard by which to weigh the evidence regarding the affirmative defense, any error in the district court's instructions on section 1515(c) was harmless and did not "improperly guide[] the jury in such a substantial way as to

violate due process." *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir.

2000) (quotation marks and citation omitted).[21]

## C.    Prejudicial Spillover.

This court set out the process for evaluating claims of prejudicial spillover in

*United States v. Prosperi*, 201 F.3d 1335(11th Cir. 2000):

> In evaluating claims of prejudicial spillover, we consider several
> factors that would indicate whether prejudice tainted the jury's
> verdict.  First, we consider whether the jury meticulously sifted the
> evidence admitted for all counts.  *See United States v. Miranda*, 197
> F.3d 1357, 1359 (11th Cir. 1999) (per curiam); *United States v.
> Stefan*, 784 F.2d 1093, 1101 (11th Cir. 1986).  Relevant to this inquiry
> is the similarity of the evidence introduced for the separate counts:
> distinct evidence is less likely to result in prejudicial spillover.  *See
> [United States v.] Pelullo*, 14 F.3d [881,] 898 [(3d Cir. 1994)]. A
> discriminating acquittal also can signal that the jury was able to sift
> through the evidence properly.  *See United States v. Eason*, 920 F.2d
> 731, 737 (11th Cir.1990); *see also Pelullo*, 14 F.3d at 899.  Second,
> we examine whether the contested evidence was inflammatory in
> nature, and thus liable to prejudice the jury.  *See [U.S. v.] Rooney*, 37
> F.3d [847,] [] 855 [(2d Cir. 1994)].  Third, we consider whether

---

[21]To be sure, there is a serious question about whether Mintmire even made a minimal showing that he was performing *bona fide* legal representation in connection with this matter. As Mintmire's counsel conceded at oral argument, to the extent Mintmire was retained to represent the corporation, he retained himself to do so.

Although Josefsberg was allowed to testify as an expert, he was not testifying in this case as a fact witness.  Josefsberg's role was limited to helping the jury interpret any such evidence that was introduced and giving an opinion as to whether such services were "lawful, bona fide, legal representation services in connection with or anticipation of an official proceeding."  Thus, Josefsberg could not provide any factual basis for Mintmire's assertion that he was acting as a lawyer in connection with the matter at issue and Mintmire did not (and could not) introduce evidence through Josefsberg to provide a factual basis for the proposition that he was "providing legal representation services," a prerequisite for the application of 18 U.S.C. § 1515(c)'s safe harbor provision.

admission of the other evidence significantly altered the defendant's trial strategy.  *See United States v. Ivic*, 700 F.2d 51, 65 (2d Cir. 1983).  Finally, we assess the strength of the evidence against the defendant on the remaining counts.  *See Rooney*, 37 F.3d at 856.

*Id.* at 1346.  We find that the Government introduced distinct, admissible evidence sufficient to sustain Mintmire's convictions on both counts.  Moreover, we find no merit in Mintmire's argument that he would have substantially altered his trial strategy if Counts Two and Three were severed from Count One.  Therefore, we conclude that Mintmire's convictions are not tainted by prejudicial spillover and should be affirmed.

## III.  CONCLUSION

For the reasons set forth above, the judgment of the district court is

**AFFIRMED.**